**IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT**

EPIC SYSTEMS CORPORATION,
*Plaintiff/Counterclaim-Defendant, Appellee/Cross-Appellant,*

v.

TATA CONSULTANCY SERVICES LIMITED & TATA AMERICA
INTERNATIONAL CORPORATION (dba TCS AMERICA),
*Defendants/Counterclaim-Plaintiffs, Appellants/Cross-Appellees.*

———————

Appeal from the U.S. District Court for the
Western District of Wisconsin, No. 14-cv-748 (Conley, J.)

**BRIEF OF APPELLEE/CROSS-APPELLANT
EPIC SYSTEMS CORPORATION**

Michael T. Brody
JENNER & BLOCK LLP
353 North Clark Street
Chicago, IL 60654
312-222-9350
mbrody@jenner.com

Rick Richmond
*Counsel of Record*
Nick G. Saros
JENNER & BLOCK LLP
633 West 5th Street, Suite 3600
Los Angeles, CA 90071
213-239-5100
rrichmond@jenner.com
nsaros@jenner.com

Anthony A. Tomaselli
Kristin G. Noel
QUARLES & BRADY LLP
33 East Main Street, Suite 900
Madison, WI 53703
608-251-5000
anthony.tomaselli@quarles.com
kristin.noel@quarles.com

*Attorneys for Appellee/Cross-Appellant Epic Systems Corporation*

<u>CIRCUIT RULE 26.1 DISCLOSURE STATEMENT</u>

Appellate Court No. <u>Nos. 19-1528, 19-1613</u>

Short Caption: <u>Epic Systems Corporation v. Tata Consultancy Services Limited, et al.</u>

     To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

     The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[x]    PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    <u>Epic Systems Corporation</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the District Court or before an administrative agency) or are expected to appear for the party in this court:

    <u>Jenner & Block LLP;</u>

    <u>Quarles & Brady LLP</u>

(3)    If the party or amicus is a corporation:

    i)    Identify all of its parent corporations, if any; and
       <u>None</u>

    ii)    list any publicly held company that owns 10% or more of the party's or amicus' stock:
       <u>None</u>

Attorney's Signature <u>s/ Rick L. Richmond</u>    Date: <u>September 23, 2019 (new)</u>

Attorney's Printed Name: <u>Rick L. Richmond</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes**  <u>  X  </u>
  **No**

Address:    <u>633 West 5th Street, Suite 3600</u>
          <u>Los Angeles, CA 90071</u>

Phone Number: <u>213-239-5151</u>    Fax Number: <u>213-239-5161</u>

E-Mail Address: <u>rrichmond@jenner.com</u>

rev. 01/15 GA

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No. Nos. 19-1528, 19-1613

Short Caption:   Epic Systems Corporation v. Tata Consultancy Services Limited, et al.

     To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

     The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[x]**    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    Epic Systems Corporation

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the District Court or before an administrative agency) or are expected to appear for the party in this court:

    Jenner & Block LLP;

    Quarles & Brady LLP

(3)    If the party or amicus is a corporation:

      i)    Identify all of its parent corporations, if any; and
        None

      ii)    list any publicly held company that owns 10% or more of the party's or amicus' stock:
        None

Attorney's Signature  s/ Nick G. Saros    Date:  September 23, 2019 (new)

Attorney's Printed Name:  Nick G. Saros

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes**
       **No**   X

Address:    633 West 5th Street, Suite 3600
           Los Angeles, CA 90071

Phone Number:  213-239-5175    Fax Number:  213-239-5199

E-Mail Address:  nsaros@jenner.com

rev. 01/15 GA

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No. Nos. 19-1528, 19-1613

Short Caption:    Epic Systems Corporation v. Tata Consultancy Services Limited, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[x]     PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Epic Systems Corporation

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the District Court or before an administrative agency) or are expected to appear for the party in this court:

Jenner & Block LLP;

Quarles & Brady LLP

(3)     If the party or amicus is a corporation:

i)     Identify all of its parent corporations, if any; and
None

ii)     list any publicly held company that owns 10% or more of the party's or amicus' stock:
None

Attorney's Signature   s/ Michael T. Brody                    Date:  September 23, 2019          (new)

Attorney's Printed Name:  Michael T. Brody

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     **Yes**
                                                                                                                **No**     X

Address:     353 North Clark Street
                  Chicago, IL 60654-3456

Phone Number:  312-923-2711                    Fax Number:  312-527-0484

E-Mail Address:  mbrody@jenner.com

rev. 01/15 GA

<u>CIRCUIT RULE 26.1 DISCLOSURE STATEMENT</u>

Appellate Court No. <u>Nos. 19-1528, 19-1613</u>

Short Caption: <u>Epic Systems Corporation v. Tata Consultancy Services Limited, et al.</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    **[x]    PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    Epic Systems Corporation

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the District Court or before an administrative agency) or are expected to appear for the party in this court:

    Jenner & Block LLP;

    Quarles & Brady LLP

(3)    If the party or amicus is a corporation:

    i)    Identify all of its parent corporations, if any; and
        None

    ii)    list any publicly held company that owns 10% or more of the party's or amicus' stock:
        None

Attorney's Signature  <u>s/ Anthony A. Tomaselli</u>       Date:    <u>September 23, 2019</u>

Attorney's Printed Name: <u>Anthony A. Tomaselli</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes**    _____
    **No**     x

Address:    <u>33 East Main Street, Suite 900, Madison, WI 53703</u>

Phone Number: <u>(608) 251-5000</u>       Fax Number:   <u>(608) 251-9166</u>

E-Mail Address: <u>aat@quarles.com</u>

rev. 01/15 GA

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No. Nos. 19-1528, 19-1613

Short Caption:   Epic Systems Corporation v. Tata Consultancy Services Limited, et al.

      To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

      The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

      **[x]    PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

      Epic Systems Corporation

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the District Court or before an administrative agency) or are expected to appear for the party in this court:

      Jenner & Block LLP;

      Quarles & Brady LLP

(3)     If the party or amicus is a corporation:

    i)     Identify all of its parent corporations, if any; and

        None

    ii)    list any publicly held company that owns 10% or more of the party's or amicus' stock:

        None

Attorney's Signature   s/Kristin Graham Noel      Date:   September 23, 2019

Attorney's Printed Name:   Kristin Graham Noel

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ____
   **No**   x

Address:    33 East Main Street, Suite 900, Madison, WI 53703

Phone Number:  (608) 251-5000      Fax Number:    (608) 251-9166

E-Mail Address:  kgn@quarles.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES................................................................. ix

INTRODUCTION......................................................................... 1

JURISDICTIONAL STATEMENT.................................................. 2

ISSUES PRESENTED FOR REVIEW ............................................ 2

ADDITIONAL ISSUE ON CROSS-APPEAL ..................................... 3

STATEMENT OF THE CASE ........................................................ 3

    A. The Parties ...................................................................... 3

    B. Kaiser Restricts TCS's Access To Epic's Information............... 4

    C. TCS Seeks Access To Epic's Confidential Information............. 6

    D. TCS Gains Improper Access To Epic's Confidential Information.............. 9

    E. Whistle Blower Report Leads To Epic's Investigation ............ 10

    F. TCS's Misconduct Continues Into Litigation ........................ 13

        1. TCS Management Ignored Unlawful UserWeb Access....................... 14

        2. TCS Failed To Investigate Kaiser's Report ........................ 14

        3. TCS Engaged In Discovery Abuse .................................... 15

        4. The District Court Issued An Adverse Inference Instruction............. 19

    G. TCS Used Epic's Information ............................................. 21

    H. Trial And Verdict ............................................................ 26

    I. Post-Trial Proceedings .................................................... 28

STANDARD OF REVIEW ............................................................ 29

SUMMARY OF ARGUMENT........................................................ 29

ARGUMENT ............................................................................ 30

I. THE JURY'S COMPENSATORY DAMAGE AWARD IS SUPPORTED BY SUBSTANTIAL EVIDENCE...................................................... 30

    A. Wisconsin Allows Compensatory Damages Based On The Value Of Misappropriated Information ................................................ 31

    B. Expert Britven's Analysis Supports The Jury's Compensatory Damages Award .................................................................... 34

        1. Britven Calculated, And The Jury Awarded, Damages Based On TCS's Use Of Epic's Information In The Comparative Analysis ......... 34

        2. The Adverse Inference Instruction Permitted The Jury To Infer Details Of TCS's Use ........................................................ 37

        3. TCS's Remaining Arguments Are Unpersuasive ............................. 39

    C. TCS Is Not Entitled To A New Trial ...................................... 43

II. THE PUNITIVE DAMAGE AWARD IS PROPER........................................... 44

    A. Because The Jury Awarded Epic Compensatory Damages, Its Award Of Punitive Damages Is Proper .................................... 44

    B. The Punitive Damage Award Is Constitutional....................... 47

    C. The Punitive Damage Award May Not Be Set Aside On The Ground It Is A General Verdict......................................................... 50

        1. TCS Fails To Present Grounds To Reverse A General Verdict ........... 51

        2. The Punitive Damages Award Addressed TCS's Conduct................. 51

        3. Punitive Damages Were Not Based On A Claim That Cannot Support Punitive Damages As A Matter Of Law .............................. 54

CROSS-APPEAL ................................................................................. 55

SUMMARY OF ARGUMENT .................................................................. 55

CROSS-APPEAL ARGUMENT ................................................................ 56

I. THE COURT SHOULD REINSTATE THE JURY'S AWARD FOR TCS'S USE OF EPIC'S OTHER CONFIDENTIAL INFORMATION................................... 56

    A. The Jury's $100 Million Compensatory Damages Award For Other Use Is Supported By Substantial Evidence........................... 56

        1. TCS Used Stolen Epic Information To Improve Med Mantra............. 56

    a. Phillipe Guionnet Connects TCS's Wrongdoing To Med Mantra Development .................................................................. 56

    b. Other Connections Between TCS's Wrongdoing To Med Mantra Development .................................................................. 58

    c. The Adverse Inference Instruction Supports The Award .............. 59

  2. The Jury Heard Evidence Regarding The Value Of The Data Model, Which Was Not Part Of The Comparative Analysis Award ..... 60

 B. The District Court Erred When It Set Aside The Portion Of The Jury's Verdict Relating To Other Use................................................... 61

CONCLUSION ............................................................................. 64

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Action Marine, Inc. v. Continental Carbon Inc.*,
481 F.3d 1302 (11th Cir. 2007) ................................................................ 48

*Adams v. City of Chicago*,
798 F.3d 539 (7th Cir. 2015) ................................................................ 56

*Aspen Technology, Inc. v. M3 Technology, Inc.*,
569 F. App'x 259 (5th Cir. 2014) ................................................... 38, 63

*Barber v. Whirlpool Corp.*,
34 F.3d 1268 (4th Cir. 1994) ................................................................ 53

*Betterman v. Fleming Cos.*,
677 N.W.2d 673 (Wis. Ct. App. 2004) ................................................ 47

*BMW of North America, Inc. v. Gore*,
517 U.S. 559 (1996) ..........................................................47, 48, 50

*Bourns, Inc. v. Raychem Corp.*,
331 F.3d 704 (9th Cir. 2003) ................................................................ 33

*CGB Occupational Therapy, Inc. v. RHA Health Services Inc.*,
357 F.3d 375 (3d Cir. 2004) ................................................................ 53

*Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*,
532 U.S. 424 (2001) ................................................................ 47

*Creative Demos, Inc. v. Wal-Mart Stores, Inc.*,
142 F.3d 367 (7th Cir. 1998) ................................................................ 44

*In re Cross Media Marketing Corp.*,
No. 06 CIV. 4228(MBM), 2006 WL 2337177 (S.D.N.Y. Aug. 11,
2006) ................................................................ 33

*Crossley by Crossley v. General Motors Corp.*,
33 F.3d 818 (7th Cir. 1994) ................................................................ 43

*CSX Transportation, Inc. v. Hensley*,
556 U.S. 838 (2009) ................................................................ 37

*Culli v. Marathon Petroleum Co.*,
862 F.2d 119 (7th Cir. 1988) ................................................................ 51

ix

*Deimer v. Cincinnati Sub-Zero Products, Inc.,*
    58 F.3d 341 (7th Cir. 1995) ..........................................29, 31, 56

*E.E.O.C. v. AutoZone, Inc.,*
    707 F.3d 824 (7th Cir. 2013) .................................................... 30

*E.J. Brooks Co. v. Cambridge Security Seals,*
    No. 12-CV-2937 (LAP), 2015 WL 9704079 (S.D.N.Y. Dec. 23,
    2015) ....................................................................................... 33

*Entertainment USA, Inc. v. Moorehead Communications, Inc.,*
    897 F.3d 786 (7th Cir. 2018) .................................................... 40

*Estate of Escobedo v. Martin,*
    702 F.3d 388 (7th Cir. 2012) .................................................... 29

*Fail-Safe LLC v. A.O. Smith Corp.,*
    744 F. Supp. 2d 831 (E.D. Wis. 2010).................................... 42

*Groshek v. Trewin,*
    784 N.W.2d 163 (Wis. 2010) .................................................... 45

*Halverson v. River Falls Youth Hockey Ass'n,*
    593 N.W.2d 895 (Wis. 1999) .................................................... 42

*Interclaim Holdings Ltd. v. Ness, Motley, Loadholt, Richardson &
Poole,*
    298 F. Supp. 2d 746 (N.D. Ill. 2004) ....................................... 48

*JustMed, Inc. v. Byce,*
    600 F.3d 1118 (9th Cir. 2010) ........................................... 41, 42

*Kimble v. Land Concepts, Inc.,*
    845 N.W.2d 395 (Wis. 2014) .................................................... 50

*Kossman v. Northeast Illinois Regional Commuter Railroad Corp.,*
    211 F.3d 1031 (7th Cir. 2000) .................................................. 51

*Kronisch v. United States,*
    150 F.3d 112 (2d Cir. 1998) .................................................... 63

*Lindquist Ford, Inc. v. Middleton Motors, Inc.,*
    557 F.3d 469 (7th Cir. 2009) .................................................... 42

*Ludyjan v. Continental Casualty Co.,*
    747 N.W.2d 745 (Wis. Ct. App. 2008)................................ 31, 34

*Management Computer Services, Inc. v. Hawkins, Ash, Baptie & Co.,*
  557 N.W.2d 67 (Wis. 1996) ...........................................................42, 49, 50

*Marrero v. Goya of Puerto Rico, Inc.,*
  304 F.3d 7 (1st Cir. 2002) ........................................................ 53

*McGrath v. Zenith Radio Corp.,*
  651 F.2d 458 (7th Cir. 1981) .................................................... 51

*Mid-America Tablewares, Inc. v. Mogi Trading Co.,*
  100 F.3d 1353 (7th Cir. 1996) .................................................. 63

*Minnesota Mining & Manufacturing Co. v. Pribyl,*
  259 F.3d 587 (7th Cir. 2001) ............................................... 40, 41

*Minuteman, Inc. v. Alexander,*
  434 N.W.2d 773 (Wis. 1989) .................................................... 32

*Murphy Door Bed Co. v. Interior Sleep System, Inc.,*
  874 F.2d 95 (2d Cir. 1989) ....................................................... 53

*Northern Air Services, Inc. v. Link,*
  809 N.W.2d 900, 2012 WL 130531 (Wis. Ct. App. 2012) .................... 32, 45

*Olympia Equipment Leasing Co. v. Western Union Telegraph Co.,*
  797 F.2d 370 (7th Cir. 1986) .................................................... 63

*Pro-Pac, Inc. v. WOW Logistics Co.,*
  721 F.3d 781 (7th Cir. 2013) .................................................32, 45, 46, 54

*Robertson Oil Co. v. Phillips Petroleum Co.,*
  871 F.2d 1368 (8th Cir. 1989) ............................................. 52, 53

*Schiller & Schmidt, Inc. v. Nordisco Corp.,*
  969 F.2d 410 (7th Cir. 1992) .................................................... 41

*State Farm Mutual Automobile Insurance Company v. Campbell,*
  538 U.S. 408 (2003) ...........................................................47, 48, 49

*Strenke v. Hogner,*
  694 N.W.2d 296 (Wis. 2005) .................................................... 47

*Tucker v. Marcus,*
  418 N.W.2d 818 (Wis. 1988) .................................................... 45

*TXO Production Corp. v. Alliance Resources Corp.,*
  509 U.S. 443 (1993) ............................................................... 48

*United States E.E.O.C. v. Century Broadcasting Corp.*,
957 F.2d 1446 (7th Cir. 1992) .................................................. 44

*United States v. 47.14 Acres of Land, More or Less, Situate in Polk
County, Iowa*,
674 F.2d 722 (8th Cir. 1982) .................................................. 41

*United States v. Bradshaw*,
719 F.2d 907 (7th Cir.1983) .................................................. 61

*Venson v. Altamirano*,
827 F. Supp. 2d 857 (N.D. Ill. 2011), *aff'd*, 749 F.3d 641 (7th
Cir. 2014) ....................................................................... 61-62

*Willis v. Marion County Auditor's Office*,
118 F.3d 542 (7th Cir. 1997) ............................................ 29, 30

*Yung v. Grant Thornton, LLP*,
563 S.W.3d 22 (Ky. 2018) ...................................................... 48

## STATUTES

19 U.S.C. § 1030(g) ................................................................ 26

Wis. Stat. § 134.90 ................................................................ 32

Wis. Stat. § 943.70(2)(a) ......................................................... 26

## OTHER AUTHORITIES

Fed. R. Civ. P. 50 ................................................................. 30

Fed. R. Civ. P. 52 ................................................................. 30

*Restatement (Second) of Torts* § 903, Westlaw (database updated
June 2019) ........................................................................ 45

*Restatement (Third) of Restitution* § 49(3), Westlaw (database
updated June 2019) .......................................................... 32, 33

*Restatement (Third) of Restitution* § 51(2), Westlaw (database
updated June 2019) .......................................................... 33, 42

## INTRODUCTION

TCS stole thousands of confidential Epic documents containing trade secrets, used that information in its business, and did not stop until it was caught, yet TCS argues the Court should ignore TCS's wrongful acts and litigation misconduct and TCS should pay nothing. The Court should deny TCS's request and uphold the jury's verdict.

TCS knew it could not access Epic's UserWeb, a private web portal containing Epic's trade secrets and confidential information. Yet, as the jury found, countless TCS employees accessed Epic's UserWeb and stole Epic's information, with the knowledge and approval of TCS management. Until its brief on appeal, TCS denied liability for that misconduct. Even now, TCS does not begin to describe its misdeeds. Since 2014 when TCS was first asked to investigate its improper actions, TCS pursued a self-described strategy to "suppress the truth" as directed by TCS management. TCS engaged in substantial discovery abuse causing the trial court to instruct the jury that it could draw an adverse inference against TCS because of TCS's failure to preserve electronic information from critical computers and servers, and other discovery misconduct. On appeal, TCS does not challenge the jury's liability verdict or the district court's adverse inference instruction.

Instead, TCS argues this Court should ignore TCS's wrongdoing and set aside the jury's verdict because Epic was unable to prove with precision the degree to which TCS used the confidential information it stole. In other words, having stolen hundreds of thousands of pages of Epic's information, obviously

for some purpose, and having concealed what it did, again for a reason, TCS asks this Court to overturn the jury's verdict and reward TCS with a judgment in its favor.

TCS's argument is as incorrect as it is morally bankrupt. Epic proved, and the jury found, TCS engaged in a campaign of corporate espionage, followed by a further campaign to conceal its wrongdoing. TCS used Epic's confidential information in its comparative analysis to assess its competing product and to sell it to Epic's largest customer. Epic need not prove the value TCS derived from the information or that it used it in a competing product. Wisconsin law allows compensatory damages for the value of the misappropriated information, and Epic presented sufficient evidence to sustain the verdict.

## JURISDICTIONAL STATEMENT

TCS's jurisdictional statement is complete and correct.

## ISSUES PRESENTED FOR REVIEW

1.  Whether the jury's $140 million compensatory damage award should be upheld based on substantial evidence that TCS used Epic's information in its comparative analysis.

2.  Whether the jury's award of punitive damages should be sustained where Epic demonstrated entitlement to punitive damages and the amount complied with Wisconsin law and due process.

## ADDITIONAL ISSUE ON CROSS-APPEAL

Whether the Court should reinstate the jury's additional compensatory damage award of $100 million, and corresponding $200 million punitive damage award, where those awards were supported by substantial evidence.

## STATEMENT OF THE CASE

### A.    The Parties.

Epic, based in Verona, Wisconsin, is a world-wide leader in Electronic Health Record ("EHR") software, which is used by an estimated 281,000 physicians worldwide and manages the care and records of an estimated 169 million patients. (R.944, 3.[1]) Epic's software captures information about patient care, including records of admissions, pharmacy, billing, and insurance. (R.889, 92:25-94:4 (Faulkner).)   Since its founding in 1979 by Judy Faulkner, who continues to lead Epic today, Epic has developed its software through the diligent work of Ms. Faulkner and other Epic employees at an investment of billions of dollars. (*Id.*, 85:14-89:22 (Faulkner); SA71:7-14 (Martin).)

Tata Group is one of the largest companies in the world.  Headquartered in Mumbai, India, Tata Group owns or controls Tata Consultancy Services ("TCS"), an information technology services consulting business employing more

---

[1] In this brief, "R.___" refers to docket entries in the district court record; "Ex.__" refers to admitted trial exhibits; and "A" and "SA" refer to TCS's Appendix and Separate Appendix filed with this Court.

than 300,000 employees.  (R.901, 33-34.)  In 2014, TCS generated $15.5 billion in global revenue and $3.5 billion in profit.  (R.870; SA326:17-21.)[2]

Kaiser Permanente ("Kaiser") is the largest managed healthcare organization in the United States.  (R.977, 3.)  In 2003, Kaiser and Epic entered into a written agreement (the "Kaiser Agreement") under which Epic licensed software to Kaiser to support Kaiser's activities nationwide.  Epic provided Kaiser access to Epic's web portal called UserWeb, subject to provisions protecting Epic's confidential information.  (Ex.2004_0003.)

Epic's software varies from customer to customer.  Epic updates and releases new versions of its software.  Customers, such as Kaiser, configure Epic's software to their own systems. (R.889, 107:17-108:12 (Martin).)  In addition, each customer tests the software to make sure it operates properly in its own system.  (*Id.*)  Kaiser hired TCS to aid its installation and operation of Epic's software.  (*Id.*, 110:8-25.)

TCS developed and marketed a competing EHR software known as "Med Mantra."  The fact that TCS was a competitor was of concern to Epic when TCS began working with Kaiser.  (R.900, 92:3-93:12 (Dvorak).)

**B.    Kaiser Restricts TCS's Access To Epic's Information.**

Epic protects its trade secrets and other confidential information.  Epic requires its customers to execute written agreements and Epic monitors whether

---

[2] In this brief, Epic refers to defendants TCS.  Some actions were taken by TCS, others by Tata, but the distinction does not matter for any issue for this appeal.

its materials are misused. (*See, e.g.*, R.889, 100:24-102:6 (Martin); SA390-SA392.)

Epic's customer agreements provide that only authorized users may access Epic's confidential information. To obtain access to Epic's UserWeb, an individual must obtain credentials from Epic. (R.889, 118:7-15 (Martin).) In credentialing, the user must demonstrate the user is a customer by providing an email address containing an Epic customer's email domain. (*Id.*, 118:16-119:22.) Credentials are personal – Epic does not permit sharing of user names or passwords. (*Id.*, 118:1-121:21.)

Kaiser agreed to maintain the confidentiality of Epic's information. In turn, Kaiser required TCS to sign a Master Services Agreement to assure that TCS employees, who were testing Kaiser's application of Epic's software, did not violate Kaiser's obligations to Epic. (R.922-10, 44:13-50:17, 65:9-13, 66:9-13, 70:18-71:25, 73:9-25 (Jones); Exs.0004A, 0258.)

To fulfill its obligations to Epic, Kaiser insisted that the TCS employees operate in a "clean room" environment. TCS primarily performed its testing work in its Overseas Development Center ("ODC") in Chennai, India. Under agreed-upon procedures, computer workstations in the ODC were part of a virtual private network that was to be used only for Kaiser work and was to be connected only to the Kaiser network. TCS workers were not permitted to access the Internet or TCS's email system. (R.901, 141-42 (Muthuswami).) TCS was to install a firewall between its network and Kaiser's network. (*Id.*, 142:12-14.) Only authorized employees could enter the room and any information

downloaded or copied had to be printed on colored paper so that it could be identified if removed from the ODC. USB drives and CD drives were to be disabled on the Kaiser workstations and employees were not allowed to use cellphones in the "clean room." (R.922-15, 14:5-15:4 (McCarthy); R.904, 149:21-150:15 (Laykin).)

Kaiser audited TCS's compliance. (R.922-10, 106:15-107:16 (Jones).) Kaiser discovered in its 2011 audit that TCS employees in the ODC had access to the internet, and thus to TCS's network. (R.922-15, 40:4-7, 51:2-52:23, 54:4-9 (McCarthy).) To eliminate this risk, yet to allow ODC employees to access TCS information for non-Kaiser matters, Kaiser allowed two computers in the ODC – known as "kiosk computers" – to access the TCS network, including "shared drivers, e-mail servers, and TCS's knowledge management system." (R.922-15, 65:24-66:8, 69:13-70:19, 71:20-72:8 (McCarthy); Ex.0537.) The kiosk computers were not allowed to have access to Kaiser materials. (R.901, 143:3-19 (Muthuswami).) Kaiser believed it had contained the risk of misuse of computers in the clean room. (Exs.0537, 0538.)

### C. TCS Seeks Access To Epic's Confidential Information.

Epic strictly limits consultants' access to Epic's information. Consultants, such as TCS, do not have access to UserWeb features available to customers, including training materials, discussion forums, or library documents. (R.889, 140:18-142:3 (Martin).) A consultant doing testing would not need access to detailed documents on UserWeb about Epic's software. (*Id.*, 128:11-129:5.) Even TCS witnesses confirmed there was not "any reason whatsoever" for TCS

6

employees performing testing for Kaiser to access the UserWeb. (R.901, 71:2-9 (Sundar); R.922-16, 194:18-195:7 (Medikonda).)

Despite having no legitimate need for access to Epic's UserWeb, TCS tried to gain access. Starting as early as April 2011, individuals claiming to be Kaiser employees registered with Epic to receive training. (Ex.0183.) After confirming with Kaiser that the individuals were TCS employees consulting for Kaiser, Epic removed the TCS employees from the training course. (Ex.0183.)

Thereafter, Epic and TCS entered into the TCS Agreement whereby Epic agreed to allow certain TCS employees limited access to certain Epic materials other than UserWeb. TCS acknowledged Epic's property contained trade secrets and was legally protected. TCS agreed:

- to limit access to Epic's property to those TCS employees who must have access to implement the program on Kaiser's behalf;

- not to use the program property for any other purpose;

- to require any of its employees who were given access to confidential information to agree, in writing, to nondisclosure of that information and to limiting its use to consulting for Kaiser;

- to notify Epic if it, or its employees, knew that it had copied or obtained possession of confidential information without authorization from Epic; and

- TCS employees with access to Epic's information would not participate in any activity in competition with Epic.

(SA390-SA392.) Still, Epic allowed TCS only limited access, which did not include UserWeb, because Epic knew TCS was trying to develop and market in the United States its competing Med Mantra product. (Ex.1064.)

TCS used other means to obtain access to Epic's confidential information. TCS's president, Suresh Muthuswami repeatedly asked Epic's president, Carl Dvorak, for TCS and Epic to enter into a partnership. Muthuswami sent Dvorak a draft agreement in the fall of 2011, in which TCS promised that consultants who were testing Epic's software would not be involved with TCS's development of its competitive Med Mantra software. (*See* Ex.0143.) Muthuswami knew Epic was concerned that "somehow confidential information might find it's [sic] way to the Med Mantra team." (R.901, 147:21-25.) He proposed that "if Epic shares proprietary and confidential information, it will stay within the Kaiser team and not be shared with the Med Mantra team." (*Id.*, 148:16-20.)

Throughout 2011 and into the spring of 2012, Epic's Dvorak gave no indication that Epic would ever be interested in a partnership with TCS because of Epic's concerns about Med Mantra. In the meantime, unbeknownst to Epic, an unnamed TCS employee gained unauthorized access to Epic's information. (Exs.0183, 0492.) When that one employee left TCS, TCS's Muthuswami was warned by a subordinate: "There was one guy in our team who had access to EPIC. He left us recently. Now, we have no one. Dire state. Need to have Carl [Dvorak] give us access to EPIC[.]" (Exs.0163, 0285.) The situation was also described as "dire" in a separate TCS email: "[w]ith another [employee], who had access to Epic Userweb resigning, we are really in dire need of that access to keep the business running." (Ex.0492.) TCS's Muthuswami pressed Epic's Dvorak again, who explained that Epic was unwilling even to discuss a

partnership because TCS's Med Mantra was a competing product. (Exs.0154, 0164.)

**D.    TCS Gains Improper Access To Epic's Confidential Information.**

With its access to Epic's confidential information shut off, TCS hired a new employee, Ramesh Gajaram. (R.891, 52:8-10.) Prior to TCS, Gajaram worked in India for a company called "CSC" that consulted for Kaiser. (*Id.*, 54:24-55:5.) At CSC, Gajaram had obtained access to UserWeb using a Kaiser email address. (*Id.*, 55:6-56:7; R.900, 67:1-11; TCS Br. 15.) The district court recognized there was sufficient evidence for the jury to infer that TCS hired Mr. Gajaram "because" of his access to UserWeb. (R.538, 16 n.10.)[3]

After Gajaram started at TCS, the head of TCS's Chennai ODC, Mukesh Kumar, discussed Gajaram's Epic credentials with him approximately ten times. (R.891, 58:19-59:11.) Gajaram informed TCS he had access to Epic, logged onto Epic's system, and showed Kumar the UserWeb portal and what the Epic data looked like. (*Id.*)

At TCS, Gajaram continued to access UserWeb using his CSC credentials, but TCS's improper access was not limited to Gajaram. Gajaram shared his Epic credentials with other TCS employees. (R.891, 59:15-23.) Gajaram testified that after he shared his credentials, he had no idea what those individuals did with his Epic credentials, including who else obtained his password. (*Id.*, 60:21-61:7.)

---

[3] *See* R.891, 79:11-23 (Gajaram was likely recommended to work for TCS based on his past experience testing Epic's software); *id.* 78:10-18, 79:3-4 (TCS offered him a "far better" pay package than he had at CSC).

There were several hundred TCS employees working on the Kaiser account at that time. (R.901, 140:13-20.) Kumar was aware that Gajaram was sharing his credentials; Kumar never told Gajaram to stop. (R.891, 59:24-60:4.)

Gajaram's credentials were frequently used to access the Epic UserWeb through the TCS kiosk computers. (R.902, 41:3-15.) Those computers had access to a SharePoint site called Ultimatix available to every TCS employee. (R.891, 57:13-25.) From the kiosk computer, TCS employees accessed the Epic system to copy and download Epic documents to TCS email, to other email services through the Ultimatix system, and to other users outside of the Kaiser or Epic networks. (*Id.*, 57:9-12, 58:1-18.) Gajaram himself downloaded and distributed Epic information from UserWeb. (*See* Ex.0129.) For example, Gajaram sent a zip file containing a group of Epic documents outside of TCS to a CSC employee who did not have access to UserWeb. (Ex.0118; R.891, 65:18-67:2.)

TCS appointed an information security coordinator or "ISC" who was responsible to make sure the hundreds of TSC employees in the ODC honored Kaiser's and Epic's security controls. (R.891, 62:1-63:17.) The ISC in Chennai was Gajaram. (*Id.*, 63:18-20.)

### E.    Whistle Blower Report Leads To Epic's Investigation.

In June 2014, Epic received an unsolicited email from TCS employee Phillipe Guionnet indicating that TCS personnel had been accessing Epic's UserWeb without proper authorization and that information obtained through that access was being used by TCS to support its competing Med Mantra

software. (Ex.0096.) Guionnet was a senior TCS employee who was responsible for managing TCS's contract with Kaiser. (R.900, 125:1-20, 129:23-130:11.) According to Guionnet, TCS leaders in the United States and India were aware of and complicit in TCS's scheme to gain access to UserWeb. (R.890, 9:13-11:23.) Guionnet revealed that an access credential from a single individual for UserWeb had been used by TCS in India to access and download information from UserWeb. (*See* Ex.0096_0001.) Guionnet disclosed TCS's purpose was to use information and documents relating to Epic's software to benefit TCS's competing product. (Ex.0096.)

Epic took action immediately. Its investigation revealed that credentials associated with Gajaram, then working in Portland, Oregon, had been used to access Epic's UserWeb and download information from an IP address in India, meaning that someone within TCS, but outside the Kaiser network, used Gajaram's login credentials. (Ex.2062_0018.) Epic's documents were even downloaded from Indian IP addresses not affiliated with TCS. (*Id.*)

The access using Gajaram's credentials was far greater than any individual would need to do his or her job. (R.889, 151:24-154:1.) TCS had downloaded at least 6,477 documents accounting for 1,687 unique files from the UserWeb from 2012 into 2014. (*See id.*, 154:4-16; R.900, 11:12-21; Exs.2100, 2101.) Some of Epic's training materials were stored on TCS's KNOWMAX system and were available on any TCS computer. (R.809, 3 ¶9.) All of the downloaded documents were confidential. (R.900, 25:8-11 (Martin).)

TCS accessed documents that had nothing to do with Kaiser. (R.889, 151:24-154:1.) TCS accessed Epic's "Beaker" module, for example, a system used for medical laboratories, even though Kaiser did not use Beaker. (*Id.*, 152:10-154:1.) TCS downloaded a Beaker administrative document showing capabilities of the system and other documents with trade secret information. (*Id.*, 157:2-19.)

Approximately 75% of the downloaded documents included trade secrets. (R.900, 25:12-26:2.) For example, Gajaram's credentials were used to download "The Chronicles Programmer's Guide," a several-thousand page document containing information about Epic's database management capabilities, how it stores information, and other unique information necessary to have a database tuned for healthcare applications. (R.889, 157:20-159:19; Ex.2126.)

TCS also accessed and distributed an unknown amount of Epic information by viewing that information on UserWeb without downloading it, or by using a copy-and-paste tool to put Epic's information into emails or documents, neither of which would appear in Epic's download logs. (R.891, 58:15-18 (Gajaram); R.815, 1 ¶9 (Kartha Stip.); R.809, 7 ¶9 (Ponnambalan Stip.); R.922-8, 72:24-73:8 (Gunasekaran); R.895, 54:23-55:4 (Laykin).) Indeed, UserWeb documents were viewed using Gajaram's credentials more than 100,000 times. (R.895, 164:17-165:5 (Martin).)

After Epic cancelled Gajaram's UserWeb access, Gajaram tried to reinstate his access by falsely identifying himself as a Kaiser employee by changing his

email signature line to make it appear he worked for Kaiser. (R.891, 68:19-75:5; Exs.0122-0124.)

Once informed of TCS's wrongful UserWeb access, Kaiser confronted Gajaram regarding his downloading of Epic data. (R.902, 40:15-18 (Menon); R.891, 75:8-15.) Gajaram initially denied downloading any Epic materials, but when presented with download logs associated with his account, Gajaram admitted he had provided his access credentials to other TCS employees. (R.891, 75:16-76:25.) Before this revelation, TCS had hidden its theft of Epic's information throughout 2012, 2013, and 2014. (R.922-15, 92:8-17, 110:1-15 (McCarthy).)

### F. TCS's Misconduct Continues Into Litigation.

TCS minimizes Epic's complaint about TCS's misconduct as a "grand espionage tale" about "discovery shortcomings." TCS Br. 6, 22. Actually, it was a coordinated scheme to steal Epic's trade secrets and confidential information, and then conceal its misdeeds with a campaign to "suppress the truth" in which TCS's executives and senior employees lied under oath, conducted an incomplete investigation into TCS's wrongdoings, and failed to preserve key evidence, thereby destroying it.

TCS's conduct had a significant impact on the litigation: TCS failed to determine who accessed Epic's UserWeb and what happened to the stolen information, which prevented Epic's discovery of key evidence. (Ex.2078_0004, 0009-0010; R.902, 59:2-60:12, 61:25-62:14 (Menon); R.895, 49:5-50:4 (Laykin).)

1. **TCS Management Ignored Unlawful UserWeb Access.**

At least as early as May 2012, TCS's Muthuswami knew TCS was unlawfully accessing Epic's UserWeb. (Ex.0163.) Yet Muthuswami did nothing. He failed to alert Epic, did not investigate, and sought no information on the unlawful access. (R.891, 11:9-14:7.)

TCS finally engaged counsel, Curtis Bajak, to conduct an investigation. (R.922-3, 32:11-38:03.) Bajak reported that "TCS' executives downplayed the issue" regarding the misuse of Epic's portal. (Ex.0462A_0009.) Muthuswami never told Bajak what he knew, including the "dire state" email, that a Med Mantra laboratory module was being developed for DaVita, TCS's planned strategy for Med Mantra to enter the U.S. market, or that a senior executive was near the top of both the Kaiser and Med Mantra teams. These facts were the subject of testimony before the jury. (R.922-3, 102:8-107:9, 112:4-9.) *See infra* Section G.

2. **TCS Failed To Investigate Kaiser's Report.**

After TCS's downloads from Epic's UserWeb came to light, Kaiser directed TCS in August 2014, to preserve all documents and information. (Ex.0713_0006-0007.) TCS failed to follow that instruction. TCS never identified who accessed Epic's trade secrets and confidential information, or what happened to that information. (R.895, 49:5-50:12; R.902, 61:19-62:14.)

Instead, TCS interviewed a handful of employees in 2014 and accepted their denials without checking electronic records. (R.902, 32:5-33:25 (Menon).) TCS reported to Kaiser that the wrongdoing was merely "individual lapses," not

widespread.  (Ex.0173.)  TCS even considered telling Kaiser that the wrongdoing was the act of a single person.  (Ex.0172.)

### 3. TCS Engaged In Discovery Abuse.

TCS manager Mahendra Pandian testified his supervisor told him to "suppress the truth."  (R.922-19, 107:24-109:13.)  The "suppress the truth" campaign to hide TCS's wrongdoing was pervasive – from senior TCS executives down to software testers – and took many forms.

*Failure to preserve records of copying and use.*  TCS received Guionnet's report in June 2014, was told by Kaiser to preserve evidence in August 2014 (Ex.0713_0006-0007), and this suit was filed on October 31, 2014 (R.1).  Still, TCS did not preserve electronic records until 2016 (R.903, 10:15-11:2 (Rubin)), and, as the district court instructed the jury it could infer, destroyed relevant electronic evidence.

Expert Sam Rubin, a digital forensics expert and Managing Director at Stroz Friedberg LLC, testified about three ways TCS failed to preserve, or destroyed critical evidence:

First, TCS failed to preserve its "proxy logs" that would show who at TCS accessed Epic's UserWeb, and when.  (R.903, 11:10-14:7.)  TCS typically reviews proxy logs during investigations, and acknowledged it would have been helpful in this case.  (R.902, 22:25-23:5 (Menon); *see* R.922-13, 88:23-89:7, 92:7-93:10 (Kumar).)  TCS chose not to review or preserve the web proxy logs even though both Kaiser and a TCS electronic security employee told TCS they should be

preserved. (Exs.0713_0006-0007, 0732; R.902, 47:16-51:1, 57:19-59:13 (Menon).)

The proxy logs Epic's expert eventually collected from the TCS system contained no data for 2011 or 2012, and less than half the relevant data for other years. (R.903, 11:3-22.) Rubin was provided a list compiled by Epic, not TCS, of 25 TCS employees believed to have accessed UserWeb. (*Id.*, 11:23-12:12.) Seven of those employees were not in the logs at all. (*Id.*)

Second, TCS failed to forensically image its computers to preserve the contents of their hard drives. Rubin testified that he examined "active directory" logs, which are computer system logs that identify the computers used to log onto the network, and by which user name, going back over time. (*Id.*, 14:25-17:2.) Rubin looked for reports for the 25 users believed to have accessed UserWeb. Those users logged onto 32 computers. None of those computers had been forensically imaged by TCS. (*Id.*) As a result, Epic was unable to analyze and understand what the users had done in accessing Epic's information. (*See id.*, 16:17-17:2, 18:12-19.)

Third, TCS failed to preserve information showing how the two kiosk computers were used to access Epic's UserWeb, copy information, and send that information to others. (*See* R.891, 58:1-18 (Gajaram).) TCS created forensic images of the two kiosk computers in November 2014. Notwithstanding TCS's sophistication as a technology consultant, that effort failed. (R.903, 17:3-21:8 (Rubin).) One forensic image was corrupt – the first portion of the image was overwritten with another forensic image, making it unusable. (*Id.*, 17:22-18:19,

19:22-25.) That action "render[ed] the rest of the drive as kind of an unstructured block of data, kind of like a big blob." (*Id.*, 18:9-11.) As a result, Rubin was unable to determine what documents were accessed on that kiosk computer and what was done with them. (*Id.*, 19:6-19.) As to the second kiosk computer, the forensic review revealed that on October 14, 2014, approximately one month before the computer was imaged, the computer's operating system was reinstalled. (*Id.*, 20:1-21:8.) As a result, there was only one month of information on the computer because reinstallation of the operating system was akin to "starting with a clean slate." (*Id.*) The earlier information was wiped away.

In addition, TCS failed to image any of the computers used by the TCS employees working on the Kaiser account, on Med Mantra, or TCS's other electronic health record teams. (*See id.*, 15:25-17:2.) Documents were overwritten or lost, computers were overwritten, and discovery about TCS's use of Epic's information was frustrated.

*Concealing witnesses.* TCS concealed the location of critical witness Mehendra Pandian. TCS claimed it could not locate Pandian, even though TCS interviewed him in Chennai. (R.922-19, 112:18-113:16; R.531, 9-10.) When deposed a year later, Pandian stated he and other TCS employees had been instructed by management to "suppress the truth." (R.922-19, 107:25-108:12, 112:1-11.) TCS denied knowing an employee named DV Prasad, even though TCS visited him in California. (Ex.0423; R.531, 10.) When deposed, Prasad disclosed that TCS employee Venugopal Reddy, a senior TCS executive responsible for both Kaiser's Epic work and the Med Mantra team, had placed

Prasad, a Med Mantra team member, on the Kaiser team and asked him to use confidential Epic information to compare Epic and Med Mantra. (R.922-20, 74:05-19, 168:24-170:6.) When previously deposed, Reddy denied any contact with Prasad. (R.922-21, 53:9-11.)

*False Testimony*. On appeal, TCS acknowledges its employees "lied to the investigators or were less than forthcoming." TCS Br. 20. TCS understates the nature of this misconduct, as a few examples illustrate.

<u>Mukesh Kumar</u> was a TCS Program Manager. (R.922-14, 17:7-12.) Kumar falsely testified that he had no knowledge of password sharing or of Gajaram's UserWeb access, or that employees were using UserWeb, that he never saw UserWeb, and that he never had even one discussion with Gajaram about UserWeb. (*Id.*, 30:13-31:9, 36:18-21, 37:15-18, 39:12-15, 40:1-7.) Gajaram admitted that he had at least ten conversations with Kumar about his access to UserWeb, and logged into UserWeb to show Kumar. (R.891, 58:23-60:4.)

<u>Venugopal Reddy</u> was a senior TCS executive simultaneously serving as the Kaiser Global Delivery Head and the Med Mantra Delivery Head—thereby providing a link between Epic access and Med Mantra use. (R.922-21, 36:24-37:24; Exs.0008, 0014.) When questioned about Prasad, who was suspected of being a Med Mantra employee planted on the Kaiser team to gain information on Epic, Reddy testified that he did not know Prasad, and had no direct interaction with him. (R.922-21, 53:9-11, 56:7-14.) Prasad admitted that Reddy visited him in Pleasanton, California and asked him to prepare a presentation comparing Epic and Med Mantra. (Ex.0423.)

Anmol Gupta was a TCS Business Relations Manager. (Ex.0009.) He falsely testified that he did not know if his team viewed UserWeb. (R.922-9, 51:24-53:3.) Yet, Gupta authored the "dire need" email when TCS's employee with access to UserWeb resigned. (Ex.0492.) Gupta also directed Aswin Anandhan to create a UserWeb account in another TCS employee's name. (*See* R.891, 114:11-115:8 (Anandhan).)

Vikram Vadamalai was a program and training manager for the Kaiser account. (R.922-25, 9:15-17.) He falsely testified that he did not know if any team member had access to UserWeb. (*Id.*, 44:1-3; R.922-19, 112:18-113:16 (Pandian).) Deepa Pandurangan admitted that Vadamalai instructed her to provide materials from UserWeb to other members of her team. (R.809, 5 ¶10.)

Aswin Anandhan was a test lead. (R.891, 106:1-6.) He directed subordinates to lie. (R.891, 117:9-118:18; R.922-19, 108:4-112:11, 132:5-23; R.809, 5 ¶¶11-12.) He lied to Kaiser regarding TCS's use of UserWeb. (Ex.0309_0003; R.891, 112:1-114:10, 120:15-123:16.) Anandhan and his supervisor, Anmol Gupta, created a UserWeb account for Pandurangan without her knowledge, and even claimed to be Pandurangan when applying for access. (R.891, 114:11-116:25 (Anandhan); R.809, 5 ¶¶6-7, 11-12 (Pandurangan Stip.); R.922-19, 90:24-91:17, 108:4-110:4 (Pandian).)

The jury heard many other examples.

### 4. The District Court Issued An Adverse Inference Instruction.

The district court recognized TCS's "repeated failures" to meet its discovery obligations, found that TCS's cooperation in discovery was "far below the

standard expected" by the court "in terms of timeliness, due diligence and scope of production," and called out "TCS's disappointingly incomplete, at times obstructive, approach to written discovery and 30(b)(6) depositions." (R.709, 2-3.) Taken together, TCS's discovery conduct, contractual failures to notify Epic of unauthorized access to UserWeb, failure to preserve evidence, and "suppressions of 'the truth'" warranted the adverse inference instruction. (*Id.*, 4-5.)

The district court instructed the jury that it may, but was not required to, draw an adverse inference against TCS due to its failure to preserve relevant information. The instruction provided:

> Epic contends that TCS at one time possessed evidence relating to TCS's alleged wrongful conduct -- such as data from TCS's kiosk computers or other TCS computers; TCS network and computer logs, such as web proxy logs; information known by TCS's employee witnesses, investigations relating to TCS's access of Epic's computer systems, and inspections of TCS's software solutions -- but that TCS destroyed that evidence. In contrast, TCS contends that some of this evidence never existed, and if it did that TCS neither intentionally destroyed the evidence nor caused it to be destroyed and certainly did not do so in bad faith.

> If you find by a preponderance of the evidence that Epic has proven TCS both: (1) intentionally destroyed evidence (or intentionally caused evidence to be destroyed), and (2) caused the evidence to be destroyed in bad faith, then you may assume that this evidence contained information helpful to Epic and harmful to TCS.

> In this case "bad faith" is more than mere negligence. A person destroys evidence or causes evidence to be destroyed in bad faith when it is done for the purpose of hiding adverse information. As I instructed you at the beginning of this case, you are permitted to draw, from the facts you find have been proved by either direct or circumstantial evidence, such reasonable conclusions as seem justified in light of your own experiences and common sense.

In addition, the Court has already determined that TCS breached its contractual obligation to give prompt notice of improper access to Epic's UserWeb by TCS employees. If you find by a preponderance of the evidence that TCS's failure to do so impeded Epic's ability to identify, preserve and ultimately review evidence, you may assume this evidence contained information helpful to Epic and harmful to TCS as well.

(R.905, 11:2-12:11.) TCS does not challenge this instruction on appeal.

### G. TCS Used Epic's Information.

Epic presented evidence regarding TCS's use of and benefit from Epic's information, including the following:

1. One area of testimony focused on Exhibit 39, the TCS "comparative analysis." (A66-84.) TCS wanted an analysis comparing Epic and Med Mantra so that it could "assess Me[d]Mantra" and determine whether it could "sell Me[d]Mantra to Kaiser," Epic's largest customer. (Ex.0423; R.922-20, 163:3-170:6, 172:21-173:21 (Prasad); *see also* R.895, 85:4-18 (Laykin).) TCS used the comparative analysis for that purpose.

Several months after Gajaram joined TCS and TCS employees began using his account to access the UserWeb, Muthuswami and his direct report, Syama Sundar, prepared a presentation for TCS's CEO, Natarajan Chandrasekaran, regarding TCS's "US Entry Strategy." (Exs.0159, 0159A; R.901, 81-82.) That presentation reflected their belief that there were "key gaps" in Med Mantra that would "need to be built into the platform" before TCS could sell the product to U.S. customers. (Ex.0159A_0002.) In addressing those gaps, Reddy approached Prasad, a former Med Mantra team member then working on the Kaiser team, and asked him to "prepare a presentation comparing functionality between

21

MedMantra Vs Epic … and share it with [Reddy] such that we can assess Me[d]Mantra and see if we [can] directly sell Me[d]Mantra to Kaiser or make necessary changes and then go to Kaiser." (Ex.0423.) Prasad testified he "kn[e]w it [wa]s not right" to use "confidential" customer information for such an analysis and "didn't want to get into any trouble." (R.922-20, 174:9-175:13 (Prasad).)

TCS found a willing participant in Naresh Yallapragada, a consultant from the Med Mantra team. (*See* Exs.0014, 0039.) Over a one-month period in the spring of 2014, Yallapragada worked with "Subject Matter Experts" from the Kaiser team to prepare a comparative analysis between Epic's software and its own Med Mantra software. (Exs.0204, 0209; R.922-14, 49:17-54:17, 67:23-95:5, 102:3-104:4 (M. Kumar); R.809, 1 ¶¶10-11 (Khader Stip.).)

The comparative analysis was created using Epic's information. Both Iyappan Rathina and Prasad confirmed the comparative analysis contained Epic's confidential information. (R.821, 3 ¶12 (Rathina Stip.); R.922-20, 174:9-175:4 (Prasad).)

The comparative analysis was shared with Venugopal Reddy, who was involved with both Kaiser and Med Mantra. (R.895, 131:18-132:13 (Menon).) TCS arranged for Kaiser employees to attend a Med Mantra presentation at the Apollo Hospital. (R.922-4, 46:10-50:8 (Bandarapu); R.890, 33:1-25 (Guionnet).)

As the district court recognized, Prasad's testimony regarding Reddy's request for a comparative analysis is also "circumstantial proof of TCS's interest

in accessing UserWeb documents for the improper purpose of furthering TCS's own software development." (R.538, 42.)[4]

2. Another area of testimony focused on TCS's use of Epic information to improve Med Mantra. Phillipe Guionnet testified, based on his own observations and analysis, that it was a "near certitude" that Epic's confidential information had been used to improve TCS's Med Mantra product. (R.901, 31:15-32:3.)

Guionnet was TCS's employee responsible for its Kaiser work. He attended a Med Mantra "deep dive" meeting in Hyderabad in March 2014. (R.890, 36:20-21, 37:9-38:24.) After attending a similar Med Mantra presentation one year earlier in 2013, Guionnet concluded Med Mantra was rudimentary in its functionality. (*Id.*, 150:6-15.)

During this March 2014 deep dive meeting, Guionnet sat next to a TCS employee who was introduced to him as "the interface" between the Med Mantra team and the Kaiser team. (*Id.*, 42:15-43:14.) The fact that there was an "interface" between Kaiser and Med Mantra concerned Guionnet, because Kaiser team members were supposed to be screened from the Med Mantra team. (*Id.*, 42:15-43:9.) That TCS employee had a laptop open and showed Guionnet a detailed comparison between Med Mantra and Epic, and in another instance

---

[4] "[A] reasonable fact finder might well infer an impermissible purpose" from the fact that TCS employees downloaded thousands of documents from the UserWeb (and accessed an unknown quantity of other confidential and trade secret information) even though the documents were not necessary for their work. (R.538, 40.)

among Med Mantra, Epic, and Cerner, which is another EHR provider. (R.890, 37:18-38:24.)

Guionnet testified the TCS employee's presentation revealed several ways in which the Med Mantra product now resembled Epic's product. (R.901, 31:15-32:3.) Guionnet identified the five specific kinds of Epic information he believed TCS used in developing Med Mantra: workflow, data model, functionalities, architecture, and infrastructure. (*Id.*, 31:20-32:3.) The TCS employee showed Guionnet a document with cascading information, like a spreadsheet, with multiple tabs. (R.890, 39:7-18.) Some tabs had information at a high level, other tabs had information that was more broken down, and there were also diagrams and workflows. (*Id.*) If one tab had a list of functionalities, the next tab would break one functionality into multiple steps, and then the next tab would break down those steps yet again. (*Id.*, 41:8-14.) In short, the analysis the TCS employee showed Guionnet contained "a lot more detail" than the comparative analysis created by Yallapragada. (*Id.*, 46:9-21.) Yallapragada's analysis, for example, did not contain the detailed breakdown of functionalities or the diagrams or workflow that Guionnet described. (*Compare* A74-84 *with* R.890, 39:7-18, 41:8-14.) Guionnet observed portions of the analysis relating to laboratory and ambulatory outpatient functionality; he believed both had changed over the prior year. (R.890, 42:6-22.)

The change in TCS's Med Mantra product "astounded" Guionnet and contributed to his "near certitude" that TCS had used Epic's information. (R.901, 31:15-32:3; R.890, 33:9-25.) Guionnet also explained the steps he took to

confirm his concern that Epic's confidential information had been used to improve Med Mantra. (R.890, 33:1-37:11.)

3.     A third area of evidence was based on TCS's use of Epic's confidential information to improve the lab product it developed for DaVita as part of its strategy for entering the U.S. market. Muthuswami's 2012 presentation to TCS's CEO on TCS's "US Entry Strategy" for Med Mantra recognized that there were "key gaps in functional areas" that "need[ed] to be built into" Med Mantra and concluded that this would require an "[i]nvestment of 1800 person months of development effort" for TCS to make Med Mantra ready for the U.S. market. (Exs.0159, 0159A_0002.)

Muthuswami recommended that TCS "[l]everage" the "modular architecture of Med Mantra to create and promote Departmental/Functional Solutions" and "us[e] DaVita as a reference site to promote Lab Management solution to Hospitals and Independent Laboratories." (Ex.0159A_0002.) TCS and DaVita employees testified TCS adopted this recommendation: TCS developed a lab module with DaVita, and both companies understood that TCS's goal was to use the DaVita product as a springboard to launch TCS's EHR product into the U.S. market. (Ex.0156; R.890, 8:2-9:12 (Guionnet); R.901, 78:22-25, 80:4-25 (Sundar); R.922-21, 138:21-139:22 (Reddy); R.922-12, 101:17-102:14 (Krishnaswamy).)

The DaVita project fell way behind schedule and was found to be "well below average" by an independent third-party. (Ex.0438_0004; R.815, 5-6 ¶¶10, 15 (Kowalski Stip.); R.904, 84:10-17, 85:2-86:22 (Jasti).) Around that time, TCS

employees downloaded documents related to Epic's laboratory product known as Beaker, even though Kaiser was not licensing Beaker and there was no reason for TCS to access Beaker. (Exs.2093, 2094; R.900, 22:2-9 (Beaker documents would have been "very valuable"); R.889, 153:19-154:1, 157:2-19 (Martin).) TCS's strategy appears to have worked. In 2013, TCS entered into an agreement with another U.S.-based company, Quest Diagnostics, to license TCS's laboratory solution. (Ex.0557; R.922-23, 156:10-157:20 (Srinivasan).)

### H. Trial And Verdict.

The case was tried in April 2016. The trial court bifurcated proceedings, first allowing the jury to decide liability. The jury found that TCS was liable to Epic on Epic's claims for breach of contract; computer claims (Computer Fraud and Abuse Act, 19 U.S.C. § 1030(g), and Wisconsin Computer Crimes Act, Wis. Stat. § 943.70(2)(a)); fraudulent misrepresentation; misappropriation of trade secrets; unfair competition; unjust enrichment; and deprivation of property. (SA393-95; A1-6.) TCS's appeal does not challenge the liability verdict.

After the jury found TCS liable, the district court conducted a second trial phase as to the amount of damages. Epic's expert witness Britven testified TCS "experienced an ill-gotten gain in the form of avoided R and D expenses reflecting a benefit conferred of approximately $200 million" associated with TCS's preparation of the comparative analysis. (SA123:8-12.) Using the modified "X analysis" prepared by Epic's Stirling Martin, Britven identified the specific R&D costs associated with the trade secrets and confidential information implicated in the comparative analysis. (*See id.*, SA129:18-SA130:20.)

In the "X Analysis" Martin identified the trade secrets and confidential information contained in the UserWeb documents downloaded by TCS, such as Epic's configuration options, as well as the various Epic modules associated with the information TCS downloaded. (R.900, 18:11-24:18; *see* Exs.2527A, A85.) Martin then provided relative weighting of the various trade secrets and confidential information as they pertain to the overall value of Epic's software. (Exs.2527A, A85; R.900, 24:19-27:16 (Martin).) Finally, and importantly here, Martin identified (by placing an "X" next to the appropriate row) *only* those trade secrets and that confidential information incorporated into the comparative analysis. (A85; SA83:22-SA86:12.)[5]

Britven isolated the R&D expenses (based on Epic's audited financial statements) that were incurred to develop the specific modules at issue in this case. (SA128:3-16 (Britven), SA68:3-SA69:14 (Martin).) The figure was then further reduced, with the help of the X Analysis (A85), to isolate only that information incorporated in the comparative analysis (A66-84). (SA129:5-SA131:17, SA157:12-SA158:5 (Britven).) The Data Model/Data Architecture column (weighted at 35% of the total) was removed in calculating the $200

---

[5] Martin explained a category received an "X" only if the documents downloaded by TCS contained a "substantial portion" of the total confidential and trade secret information for that particular category. (R.900, 18:20-19:23, 20:4-24, 24:15-18.) In other words, "in places where there is no X, that doesn't mean that nothing was taken;" it only means that the stolen information "didn't rise . . . to the level of a substantial portion of the full materials" containing Epic's trade secrets and confidential information for that particular category. (*Id.*, 19:23-20:3.) This had the effect of understating the gains TCS obtained as a result of its wrongdoing.

million.  (SA87:14-SA88:10, SA95:1-11 (Martin); SA136:14-23 (Britven).)  Britven took two additional deductions for coding time and technology decay over time.  (SA130:3-10, SA131:15-25, SA132:1-SA133:23.)   TCS expert Bersin testified that U.S. "engineers or software developers are paid at a much higher rate than what would have been paid to the Indian engineers."  (SA254:3-SA255:4.)  Bersin explained that "rates are generally 30 to 40 percent less [in India] than [in] the U.S."  (SA280:3-10.)

The jury identified two separate types of compensatory damages.  In "part a" of its verdict, the jury awarded $140 million for TCS's use of Epic's information in developing its "Comparative Analysis." (Applying Bersin's 30% cost-of-labor reduction to Britven's $200 million valuation yields $140 million (SA396).)  The jury awarded Epic $100 million with respect to TCS's other uses of the stolen information in "part b" of its verdict.  (*Id.*)  The jury also awarded $700 million in punitive damages.  (SA397.)

## I.  Post-Trial Proceedings.

TCS filed two post-trial motions.  First, TCS moved for judgment as a matter of law under Rule 50(a) as to liability and damages.  (R.830; R.843; R.913.)  The district court denied the Rule 50(a) motion as to liability and sustained the $140 million compensatory "part a" award.  The court set aside the separate "part b" damage verdict for TCS's other uses of Epic's information.  (A31.)  The district court reduced the punitive damages award to reflect the impact of a Wisconsin statutory cap, which limits punitive damages to twice compensatory damages.  (A31.)

Second, TCS thereafter filed a motion pursuant to Rules 50(b) and 59. (R.996.)  The district court denied this second motion, explaining that TCS "largely repeat[ed] the same arguments previously raised in its Rule 50(a) motion and previously rejected by the court."  (A32.)

## STANDARD OF REVIEW

In reviewing the denial of a motion for judgment as a matter of law after a jury verdict, the Court of Appeals applies the same standard as the district court. *Willis v. Marion Cty. Auditor's Office*, 118 F.3d 542, 545 (7th Cir. 1997).  This Court "must view the evidence in the light most favorable to the nonmoving party and ascertain whether there exists 'any evidence upon which a jury could reach a verdict for the party producing it.'" *Deimer v. Cincinnati Sub-Zero Prods., Inc.*, 58 F.3d 341, 343-44 (7th Cir. 1995) (citations omitted).  Both courts examine the evidence and all fair inferences in the light most favorable to the prevailing party and may not consider the credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of the evidence.  *Estate of Escobedo v. Martin*, 702 F.3d 388, 403 (7th Cir. 2012).

## SUMMARY OF ARGUMENT

TCS concedes liability and appeals only the award of damages.  Epic pursued two compensatory damage theories: (a) TCS used Epic's confidential information in developing the comparative analysis, for which the jury awarded $140 million; and (b) TCS used Epic's information in other ways, for which the jury awarded $100 million.  The district court set aside the $100 million award, which is the subject of Epic's cross-appeal.  *See infra* 56-63.

TCS pays scant attention to the fact that the case was tried to a jury whose $140 million compensatory award must be affirmed if supported by any evidence. Here, ample evidence showed TCS used Epic's trade secrets and confidential information in its comparative analysis. Under Wisconsin law, Epic is entitled to recover the value of the information TCS took. Here, that value was determined by a properly-instructed jury after consideration of supporting proof.

The award of punitive damages is also proper. The punitive damages rest on a foundation of compensatory damages, as Wisconsin law requires. Moreover, as reduced by the district court, the award of two times compensatory damages fully complies with constitutional limits and Wisconsin law. Finally, the punitive damages award was based on the nature of TCS's conduct, which consisted of a concerted effort to take Epic's confidential information and conceal the truth regarding TCS's actions. That conduct supports the punitive damages award, regardless of particular aspects of compensation allowed by the district court.

## ARGUMENT

### I. THE JURY'S COMPENSATORY DAMAGE AWARD IS SUPPORTED BY SUBSTANTIAL EVIDENCE.

In reviewing the district court's denial of TCS's post-trial motion, this Court applies the same deferential standard for review of jury verdicts as applied to motions for judgment as a matter of law. Fed. R. Civ. P. 50, 52; *Willis,* 118 F.3d at 545. TCS must prove *no rational jury* could have found in Epic's favor with all evidence and inferences viewed in the light most favorable to Epic. *E.E.O.C. v. AutoZone, Inc.*, 707 F.3d 824, 834-35 (7th Cir. 2013). The Court must "ascertain whether there exists any evidence upon which a jury could reach [that]

verdict." *Deimer*, 58 F.3d at 343-44 (internal quotation marks and citations omitted).

TCS fails to acknowledge this heavy burden, much less meet it. Wisconsin law permits damages based on the value of misappropriated information and Epic proved that TCS used Epic's confidential information in its comparative analysis. The evidence Epic presented, buttressed by the adverse-inference instruction TCS does not challenge, is sufficient to sustain the award.

### A. Wisconsin Allows Compensatory Damages Based On The Value Of Misappropriated Information.

TCS's argument that Epic's damages are limited to the value TCS derived from using particular stolen information, TCS Br. 34, 36, 48-49, misstates Wisconsin law.

Epic need not show TCS derived any financial benefit from the information it took. Instead, Epic may recover compensatory damages based on the value of the information TCS took. *See Ludyjan v. Cont'l Cas. Co.,* 747 N.W.2d 745 (Wis. Ct. App. 2008). In *Ludyjan*, the court stated that "a defendant who is unjustly enriched through consciously tortious conduct must pay the value of the property obtained, and 'the fact that the subject matter was of little or no worth to the person obtaining it is not material.'" *Id.* at 749 (citation omitted). The court explained "a defendant's failure to make use of property" will not defeat a claim of unjust enrichment if the defendant engaged in tortious conduct. *Id.*

TCS previously acknowledged as much. In the district court, TCS conceded Epic's claims permitted the jury to award damages in an amount that would compensate Epic for "its actual loss" or "TCS's unjust enrichment."

(R.914, 22 n.3.)  This concession reflects Wisconsin law that damages measured by the reasonable value of the benefit conferred on the defendant are an available remedy under Wisconsin's trade secrets statute, even if the information was never actually used.  *See* Wis. Stat. § 134.90; *Minuteman, Inc. v. Alexander*, 434 N.W.2d 773, 774 (Wis. 1989) ("an improper acquisition is enough to constitute a misappropriation of a trade secret, and therefore, all remedies in sec. 134.90 are available").  The restitution value is a remedy for Epic's other claims as well.  *See Pro-Pac, Inc. v. WOW Logistics Co.*, 721 F.3d 781, 786 (7th Cir. 2013) ("Wisconsin law does not limit restitution to merely unjust enrichment claims, but also allows plaintiffs to receive restitution as compensation for tort claims"); *N. Air Servs., Inc. v. Link*, 809 N.W.2d 900, 2012 WL 130531, at *4 (Wis. Ct. App. 2012) (tortfeasor "'is ordinarily liable to the other, at the latter's election, either for the damage done to the other's interests or for the value of the benefit received through the commission of the tort'" (quoting *Restatement (Second) of Torts* § 903 cmt. b)).

TCS asserts the value of confidential information used in the comparative analysis is limited to the benefit TCS derived from the comparative analysis.  TCS Br. 34, 36, 48-49.  Wisconsin law is not so limiting.  The value of the "benefit conferred" may be measured in different ways, including "the value of the benefit in advancing the purposes of the defendant," "the cost to the claimant of conferring the benefit," and "the market value of the benefit."  *Restatement (Third) of Restitution* § 49(3), Westlaw (database updated June 2019).  The choice among

these measures turns "chiefly on the innocence or blameworthiness of the defendant." *Id.* cmt. a.

Particularly, as here, where the defendant is culpable as TCS concedes, "[t]he value for restitution purposes of benefits obtained by the misconduct of the defendant ... is *not less than* their market value." *Id.* § 51(2) (emphasis added). The Restatement provides the example of an orchestra using artwork in a brochure without permission. *Id.* cmt. d, illus. 9. Even if the orchestra gained no incremental profit from using the art, and the artist is "unable to show that he suffered any" damages from the use, the orchestra is liable for the value of the material taken. *Id.*

Applying this standard, courts have awarded damages measured by the cost the plaintiff incurred to develop the trade secret or other confidential information, rather than the defendant's benefit from its use. *See, e.g.*, *Bourns, Inc. v. Raychem Corp.*, 331 F.3d 704, 710-11 (9th Cir. 2003) (affirming award of damages in misappropriation case based on plaintiff's development costs); *E.J. Brooks Co. v. Cambridge Sec. Seals*, No. 12-CV-2937 (LAP), 2015 WL 9704079, at *5 (S.D.N.Y. Dec. 23, 2015) ("a plaintiff's losses or a defendant's gains may be measured by the avoided cost of developing the trade secret" and collecting cases); *In re Cross Media Mktg. Corp.*, No. 06 CIV. 4228(MBM), 2006 WL 2337177, at *6 (S.D.N.Y. Aug. 11, 2006) (upholding misappropriation damages based on plaintiff's development costs). The avoided costs of developing a trade secret are a measure of both the plaintiff's losses and the defendant's gains. *E.J. Brooks Co.*, 2015 WL 9704079, at *5.

The jury found TCS wrongfully used Epic's confidential information in its comparative analysis, and after hearing the factual arguments TCS here recites, the jury assessed the value of the material taken at $140 million. Wisconsin law allows the plaintiff to recover the value of the material taken, and the jury rejected TCS's factual arguments that the property it took was worth less. Just as a thief cannot escape by arguing the goods he stole were worthless to him, TCS is liable for the value found by the jury of the Epic material TCS wrongfully acquired. *Ludyjan,* 747 N.W.2d at 749.

**B.  Expert Britven's Analysis Supports The Jury's Compensatory Damages Award.**

TCS argues no evidence linked TCS's use of Epic's material in its comparative analysis to the amount of the jury's award. TCS Br. 44-45. TCS is wrong. Britven's damages analysis presented the value of what TCS took from Epic and that TCS incorporated into the comparative analysis.

**1.  Britven Calculated, And The Jury Awarded, Damages Based On TCS's Use Of Epic's Information In The Comparative Analysis.**

The district court rejected TCS's argument that the compensatory damage award did not correspond to evidence regarding TCS's use of Epic's information in the comparative analysis. TCS Br. 44-45. The district court found Britven's modified damages model *was* tied to TCS's use of Epic's information in the comparative analysis:

> Epic narrowed its damages theory to TCS's use of confidential information detailed in Exhibit 39 by doing a comparative analysis of Epic's products against competing products being developed by TCS.

(A14.) Britven's "revised methodology 'ratchet[ed Epic's damages] back to something that more approximates what was actually received and apparently used by [TCS] both in the comparative model" and that "this alternative measure more closely followed evidence of TCS's actual use of Epic's proprietary information to compete for sales of software to companies for whom TCS was already providing other services," according to the district court. (A14-15.)

This finding was supported by the evidence.

First, the evidence showed TCS used Epic's information in developing the comparative analysis. Among other evidence, the jury heard that Yallapragada, a functional consultant from the Med Mantra team, worked with "subject matter experts" from the Kaiser team to prepare a comparative analysis between Epic's software and its own Med Mantra software. TCS witnesses confirmed that the comparative analysis contained Epic's confidential information. (R.821, 3 ¶12 (Rathina Stip.); R.922-20, 174:9-175:4 (Prasad).) As described in detail above, *supra* 21-23, TCS developed the comparative analysis so that it could "assess Me[d]Mantra" and determine whether it could "sell Me[d] Mantra to Kaiser." (Ex.0423.) TCS strove to "prepare a presentation comparing functionality between MedMantra Vs Epic ... such that we can assess Me[d] Mantra and see if we [can] directly sell Me[d]Mantra to Kaiser or make necessary changes and then go to Kaiser." (*Id.*) TCS shared the analysis with employees who were involved with both Kaiser and Med Mantra, with TCS partners on the Kaiser relationship, and arranged for Kaiser employees to attend a Med Mantra presentation. (R.895,

131:18-132:13 (Menon); R.922-4, 46:10-50:8 (Bandarapu; R.890, 33:1-25 (Guionnet).)

Second, expert witness Britven calculated the value of the information TCS used. Britven testified TCS "experienced an ill-gotten gain in the form of avoided R and D expenses reflecting a benefit conferred of approximately $200 million" associated with TCS's preparation of the comparative analysis. (SA123:1-12.) Using the modified "X analysis" prepared by Epic's Stirling Martin, Britven tethered the specific R&D costs associated with the trade secrets and confidential information implicated in the comparative analysis. (*See id.* SA129:5-SA131:17, SA157:12-SA158:5.)

As the district court found, the evidentiary basis for the amount of the $140 million award is "fairly straightforward to understand:" (1) TCS "took and used this information to understand and compare Epic's product to compete effectively with it;" (2) the development cost was $200 million, but reduced to $140 million due to lower labor costs in India; (3) "during this same time, TCS was actively working to create software to compete with Epic's in the United States and other parts of the world;" and (4) a "high-ranking official (Phillipe Guionnet)" was "frozen out" by TCS after raising concerns about TCS's misappropriation. (A15-16.) This concise summary coincides with Britven's testimony and provides a sufficient basis for the jury's award. TCS chose not to present alternative evidence of value, instead asserting through cross-examination and argument the stolen material was of no value. The jury's resolution of this factual issue may not now be disturbed.

Third, the jury instructions, which TCS does not challenge, permit awarding damages upon proof that:

> TCS exploited this information, for example, by developing a marketing strategy, informing its competitive position within the EHR market, or refining TCS's software products.

(R.873.) TCS concedes it used Epic's information to develop the comparative analysis for use in marketing. TCS Br. 56-57. The court instructed the jury not to consider potential future uses. (SA40:8-11.) And the verdict form question limited the compensatory damages to those due to TCS's wrongful conduct for the "Benefit of TCS's Use of Comparative Analysis." (SA396.) Juries are presumed to have followed the trial court's instructions. *CSX Transp., Inc. v. Hen*sley, 556 U.S. 838, 841 (2009).

### 2. The Adverse Inference Instruction Permitted The Jury To Infer Details Of TCS's Use.

The jury heard substantial evidence that TCS used Epic's information in the comparative analysis and as to the value of the information TCS used. As the district court found, this evidence supports the jury verdict. (A18-20.) TCS is to blame for any missing proof. The district court found TCS's misconduct merited the jury drawing an adverse inference from the absence of TCS's records. That instruction further supports the jury's conclusion that TCS used Epic's confidential information to support the $140 million award relating to the comparative analysis. The district court, which viewed the evidence, agreed: "in light of the adverse inference, the jury could reasonably conclude that Epic's trade secrets and other confidential information were used, providing a separate basis for awarding damages." (A19.)

A Fifth Circuit decision demonstrates the impact of the adverse inference. In *Aspen Technology, Inc. v. M3 Technology, Inc.,* the jury found M3 liable for trade secret misappropriation and awarded damages to Aspen. 569 F. App'x 259, 262-63 (5th Cir. 2014). On appeal, M3 argued that "Aspen never presented any evidence that M3 actually used the confidential information found it its possession." *Id.* at 265. The Fifth Circuit disagreed, holding the adverse inference instruction permitted the jury to infer that testimony they did not hear and "deleted ... documents or information" they did not see "would have been unfavorable to M3." *Id.* at 266. When combined with the "circumstantial evidence of use" offered at trial, these instructions provided jurors "a legally sufficient basis from which to determine that M3" had used Aspen's pricing calculators. *Id.*

The evidence here is stronger. Trial evidence provided a more than sufficient basis for the jury to conclude TCS took Epic's information and used that information in a variety of ways. The adverse inference instruction permitted the jury to conclude the evidence TCS destroyed "contained information helpful to Epic and harmful to TCS," and that evidence "would have shown that [Epic's] information was used for improper purposes." (R.858, 3-4.) The evidence presented at trial, buttressed by the jury's factual inferences and the adverse inference, all support the jury's verdict.[6]

---

[6] TCS states Epic rejected opportunities for more discovery. *E.g.*, TCS Br. 35. Given TCS's failure to preserve records and its campaign to suppress the truth, additional discovery would have been futile.

TCS does not address the adverse inference instruction. This omission is astonishing in light of TCS's earlier recognition that the instruction "likely influenced the jury" (R.914, 67-69), and that it may have been "determinative" (SA375:21-SA376:1).

### 3. TCS's Remaining Arguments Are Unpersuasive.

TCS substitutes headlines for analysis of the facts and law. For instance, TCS asserts Epic "concede[s] it suffered no harm." TCS Br. 4. That is untrue. The information TCS took from Epic had real and substantial value, as the jury found, and the law gives Epic a remedy for TCS's theft. Epic proved the type of loss for which Wisconsin law allows compensatory damages, even if Epic cannot point to an out-of-pocket loss.

TCS also asserts Epic concedes there was "no evidence" of "use" to develop a competing product. TCS Br. 5, 25-26. Wisconsin law does not require Epic to show that type of use in order to prevail. *See supra* Part I.A. TCS used Epic's information in the comparative analysis, entitling Epic to recover damages of $140 million.

TCS also relies on unpersuasive authority to assert the jury's compensatory damages should be reversed because Epic did not prove the stolen materials were used to develop Med Mantra.[7] TCS Br. 46-51. TCS's authority

_____

[7] TCS also misconstrues statements from Epic's counsel and expert as somehow conceding no evidence exists of use to improve Med Mantra. *See* TCS Br. 25, 28-29, 52. TCS takes Epic's counsel's statement about putting "all of those pieces together," TCS Br. 29, out of context and cuts short the relevant quote, which included: "We still are missing release notes." *Id.* (SA8:16-18.) The crux of that discussion was Epic's inability to piece together evidence when inspecting TCS's software because TCS wrongfully withheld discovery that would allow a

is inapposite. Notably, none of the cases cited include an adverse inference allowing the jury to find destroyed documents would have been favorable to the plaintiff, which would have addressed any evidentiary shortcomings in those cases.

For instance, TCS relies on *Entertainment USA, Inc. v. Moorehead Communications, Inc.*, 897 F.3d 786, 795 (7th Cir. 2018), which affirmed a *breach of contract* judgment not involving trade secrets. Unremarkably, this Court limited the damages to those resulting from conduct actually found to be subject to liability for breach, and excluded the "non-compensable" conduct. TCS focuses on that plaintiff's failure to narrow its damages case to the acts causing liability, but ignores the fact that Epic's expert did just that.

*Minnesota Mining & Manufacturing Co. v. Pribyl*, 259 F.3d 587 (7th Cir. 2001) ("*3M*"), also is of no help to TCS. TCS suggests the Seventh Circuit affirmed the district court's decision to vacate the jury's award "because there was no evidence that the defendants had actually used" a resin formula at issue in that case. TCS Br. 53. TCS fails to mention that there was also "no evidence" that the "primary developer of [the defendant's] resin sheeting manufacturing process" even "had knowledge" of 3M's proprietary formula. *3M*, 259 F.3d at

---

meaningful inspection. (*See* SA9-10.) Similarly, TCS relies on Epic's expert's testimony about identifying a UserWeb document used in connection with Med Mantra. TCS Br. 25. TCS fails to note that the expert's actual testimony was that he "didn't really have enough information to answer that question" (R893:75), due to TCS's failure to produce the required information. These were hardly concessions about the sufficiency of Epic's evidence of use by TCS, but instead dramatized TCS's discovery failures.

593, 604-05. In other words, there could be no liability for trade secret misappropriation because there was no evidence of appropriation in the first instance, which is completely different from this case. *See id.* at 604-05. *3M* says nothing about whether, to obtain damages based on the value of the material taken, a plaintiff must prove the value of defendant's use in a particular way.

TCS's citation to *Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410 (7th Cir. 1992), which involves theft of a mailing list by former employees, is similarly irrelevant. The Seventh Circuit allowed damages from the use of a stolen mailing list, but declined to award damages for the "lawful competition" from defendants. *Id.* at 415. The plaintiff failed to disaggregate the damages resulting from the stolen mailing list. *Id.* at 415-16. Similarly, TCS relies on *United States v. 47.14 Acres of Land, More or Less, Situate in Polk Cty., Iowa*, where the Eighth Circuit determined a "mistake ha[d] been made" regarding the value of land in a condemnation case, and that an expert's opinion was incorrectly based on false assumptions. 674 F.2d 722, 726 (8th Cir. 1982). Here, Epic's expert determined the value of what TCS stole as it relates to the comparative analysis.

Likewise, TCS's reliance on *JustMed, Inc. v. Byce*, 600 F.3d 1118 (9th Cir. 2010), is unpersuasive. The *JustMed* court found that the defendant, an employee not a competitor, who temporarily deleted the company's copy of computer code he wrote to gain leverage in employment negotiations, *did not* misappropriate the trade secrets because he rightfully possessed the source code

at issue and so no trade secret damages could follow. *Id.* at 1131. Here, misappropriation is undisputed.[8]

Finally, although actual use of stolen confidential information to develop a competing product is not required to recover damages for the comparative analysis, Epic presented that proof.[9] The jury awarded an additional $100 million to Epic – the "part b" damages – for TCS's use of Epic's information other

---

[8] TCS's additional cases are similarly inapplicable. *Halverson v. River Falls Youth Hockey Ass'n*, 593 N.W.2d 895 (Wis. 1999), is an "officious intermeddler" case where the plaintiff sought to recover the amount spent on improvements to land the plaintiff rented, but provided no benefit to the landlord; therefore, no damages were warranted. *Id.* at 900. In contrast, TCS is an admitted wrongdoer.

*Management Computer Services, Inc. v. Hawkins, Ash, Baptie & Co.*, 557 N.W.2d 67 (Wis. 1996), is also consistent with the rule that when a defendant engaged in conscious wrongdoing, the plaintiff need not prove use. The plaintiff failed to establish damages based on the defendant's net profits received from its wrongful act—one form of available damages. The plaintiff did not seek to prove unjust enrichment damages, which were also available. *Restatement (Third) of Restitution* § 51(2), (4) Westlaw (database updated June 2019) ("net profit" damages shall be the measure of damages awarded to a plaintiff against a "conscious wrongdoer" "[u]nless" the "market value" of the benefits obtained by the wrongdoer "imposes a greater liability").

*Lindquist Ford, Inc. v. Middleton Motors, Inc.*, 557 F.3d 469 (7th Cir. 2009) is equally off-point. The Seventh Circuit reversed on liability. The case involved the independent claim of unjust enrichment for a benefit conferred by the plaintiff on the defendant, not tort damages resulting from the culpable conduct of a wrongdoer measured with reference to the cost of misappropriated secrets. *Id.* at 477, 483.

Lastly, *Fail-Safe LLC v. A.O. Smith Corp.*, 744 F. Supp. 2d 831 (E.D. Wis. 2010), is a summary judgment decision on liability, but does not review an award of damages. In any event, the plaintiff's theory in *Fail-Safe* was that the defendant used the plaintiff's information; *Fail-Safe* does not hold that the only proper theory of damages is based on the defendant's value of that "use." *See id.* at 866.

[9] TCS cites Britven's testimony about his knowledge of evidence of copying Epic's documents. TCS Br. 52. Britven was a damages expert. His opinion did not cover "what actual use has been made of the Epic materials." (SA187:8-11.) That testimony was supplied by others.

than in the comparative analysis. In its cross-appeal, Epic addresses the evidence that TCS used Epic's information beyond its use in the comparative analysis. If proof of such use is required to sustain the $140 million verdict, Epic refers this Court to Epic's recitation of that evidence, which includes (*see infra* 56-59):

- Guionnet's testimony of his "near certainty" that TCS used Epic's information to improve Med Mantra;

- Guionnet's testimony regarding the changes to Med Mantra showing functionality reflecting Epic's software;

- The results of Guionnet's "deep dive" into changes to Med Mantra;

- TCS's improper assignment of Med Mantra employees to the Kaiser account, and vice versa; and

- TCS's theft of Beaker documents, and the changes to Beaker as part of TCS's U.S. entry strategy.

\*   \*   \*   \*

Because the evidence supported the jury's damages verdict, and TCS has not met its burden that "no rational jury" could have viewed this evidence, along with the adverse inference, to reach its $140 million damages award, the jury's compensatory damage award should be affirmed.

### C.      TCS Is Not Entitled To A New Trial.

In its alternative request for a new trial, TCS Br. 59-60, TCS fails to recognize that whether to grant a new trial is committed to the trial court's discretion and an appellate court "will not disturb that decision 'except under exceptional circumstances showing a clear abuse of discretion.'" *Crossley by Crossley v. Gen. Motors Corp.*, 33 F.3d 818, 821 (7th Cir. 1994) (citation

omitted). The proper inquiry is "'whether any reasonable person could agree with the district court.'" *United States E.E.O.C. v. Century Broad. Corp.*, 957 F.2d 1446, 1460 (7th Cir. 1992) (citation omitted). TCS's arguments do not meet that burden. Instead, TCS merely repeats its same complaints about the amount of the jury award, which the district court rejected based on ample evidence supporting the verdict. TCS relies on an inapposite case, *Creative Demos, Inc. v. Wal-Mart Stores, Inc.*, in which the district court entered judgment for lost profits damages on a promissory estoppel claim that does not support that form of damages. 142 F.3d 367, 372 (7th Cir. 1998). After the district court converted that award into an unjust enrichment award, it recognized that the appellate court was likely to reject the award and conditionally ordered a new trial should the appellate court agree, as it later did. *Id.* In contrast, the jury here properly awarded damages based on the value of the information TCS unlawfully acquired. A new trial is unwarranted.

## II. THE PUNITIVE DAMAGE AWARD IS PROPER.

The jury awarded punitive damages of $700 million, which the district court reduced to $280 million based on its decision to set aside a portion of the compensatory award and its application of a Wisconsin statutory cap on punitive damages. (A31.) TCS's arguments to set aside the $280 million punitive damage award are unpersuasive.

### A. Because The Jury Awarded Epic Compensatory Damages, Its Award Of Punitive Damages Is Proper.

TCS first argues that Wisconsin law requires the jury to award a particular type of compensatory damage – what TCS characterizes as "actual" damages –

before punitive damages are appropriate. TCS Br. 61. TCS misstates the law: Wisconsin requires only that a party receive "compensatory damages" to recover punitive damages.

In its latest decision on the issue, the Wisconsin Supreme Court held that a plaintiff must recover compensatory damages to receive punitive damages. *Groshek v. Trewin*, 784 N.W.2d 163, 175 (Wis. 2010) ("no punitive damages can be awarded because there are no compensatory damages"). *Groshek* did not hold that actual injury is necessary, or even define what is meant by "actual injury." It held because "no compensatory damages were sought or awarded," punitive damages were inappropriate. *Id.* at 176.[10]

In Wisconsin, damages awarded on a restitutionary model, as were awarded here, are "compensatory damages." *See N. Air Servs., Inc.*, 2012 WL 130531, at *3 n.4; *Pro-Pac*, 721 F.3d at 788. Wisconsin has adopted the Restatement view that damages awarded on a restitutionary theory are "compensatory" damages. *Pro-Pac,* 721 F.3d at 788; *see Restatement (Second) of Torts* § 903, cmt. b, Westlaw (database updated June 2019) (discussing unjust enrichment damages as compensatory damages). The Restatement "defines 'compensatory damages' as 'the damages awarded to a person as compensation, indemnity or restitution for harm sustained by him,'" and recognizes that

---

[10] The Wisconsin Supreme Court had reached the same conclusion in *Tucker v. Marcus*, 418 N.W.2d 818 (Wis. 1988), although the language in that earlier case was imprecise. Sometimes *Tucker* referred to actual damages and sometimes it referred to compensatory damages. In any event, *Tucker* held, as *Groshek* later clarified, that it is the award of compensatory damages that operates as a trigger for punitive damages. *Id.* at 829; *see also Groshek*, 784 N.W.2d at 174-76.

"Wisconsin has adopted this definition." *Pro-Pac,* 721 F.3d at 788 (citing *N. Air Servs., Inc.*, 2012 WL 130531, at *3 n.4). Summarizing the law of Wisconsin, this Court explained that "Wisconsin law does not limit restitution to merely unjust enrichment claims, but also allows plaintiffs to receive restitution as compensation for tort claims." *Id.* at 786. In the circumstances of this case, Wisconsin permits the aggrieved plaintiff to receive "compensatory damages" based on the value of material taken by a defendant through its improper conduct. *See supra* 31-34.

The choice of method for calculating compensatory damages has no bearing on a party's entitlement to punitive damages. This Court confirmed that "[r]egardless of whether the [lower] court awards damages premised on gain to [defendant] (*i.e.*, restitutionary damages) or loss to [plaintiff] (*i.e.*, compensatory damages), punitive damages are also available." *Pro-Pac*, 721 F.3d at 788. Wisconsin law only requires compensatory damages, and either loss to plaintiff or gain to defendant qualifies. *Id.* ("an award of punitive damages to deter intentional wrongdoing" is not "foreclose[d]" by a party's election to seek restitutionary damages under an unjust enrichment theory). Compensatory damages, however calculated, are sufficient to support punitive damages.

TCS cites no case to the contrary. TCS cites no decision of a court in Wisconsin, or elsewhere, in which punitive damages were set aside because the compensatory damages were measured using a restitutionary theory.

**B.      The Punitive Damage Award Is Constitutional.**

TCS next argues the punitive damage award is "constitutionally excessive." TCS Br. 43.  This argument was rejected by the district court and should be rejected by this Court.

The jury's award of punitive damages complies with federal due process standards.  In *State Farm Mutual Automobile Insurance Company v. Campbell*, 538 U.S. 408, 416 (2003), the Supreme Court reversed a punitive damages award that was 145 times the compensatory award, explaining that punitive damages are meant to punish unlawful conduct and deter that conduct in the future.  *See also Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 432 (2001); *Strenke v. Hogner,* 694 N.W.2d 296, 300-01 (Wis. 2005) (punitive damage standard focuses on the defendant's intent and conduct).  Punitive damages do not mathematically enhance compensatory damages – courts have rejected efforts to apply ratios fixed to compensatory loss.  *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 568 (1996) (holding that states have "considerable flexibility in determining the level of punitive damages that they will allow"); *Betterman v. Fleming Cos.*, 677 N.W.2d 673, 684 (Wis. Ct. App. 2004) ("While there must be a reasonable relationship between the amount of compensatory and punitive damages, there is no multiplier or fixed ratio of compensatory to punitive damages.").

In *Campbell*, the Supreme Court directed lower courts to consider the three factors previously identified in *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 575 (1996): (1) reprehensibility of the defendant's conduct; (2) the disparity

between actual or potential harm suffered by the plaintiff and the punitive award; (3) and the difference between the punitive award and comparable civil penalties. 538 U.S. at 418. TCS fails to consider these factors.

Focusing first on the degree of reprehensibility of the conduct, courts must consider all aspects of the defendant's conduct, including: whether the harm caused was physical; whether the defendant evinced indifference or reckless disregard to the health or safety of others; whether the target was financially vulnerable; whether the conduct involved repeated actions or was an isolated incident; and whether the harm was the result of intentional malice, trickery, or deceit, as opposed to mere accident. *Gore*, 517 U.S. at 576-77.

TCS mentions only the health and safety, and financial vulnerability factors, ignoring the reprehensibility factors that support the jury's finding. TCS's conduct was not an isolated incident, but involved repeated actions, and TCS's actions caused harm through intentional deceit. Here, the reprehensibility of TCS's conduct supports an award of punitive damages.[11]

---

[11] With respect to the factors TCS addresses, courts have upheld punitive damages in cases involving commercial loss and have done so where the plaintiff is not financially vulnerable. *See Yung v. Grant Thornton, LLP*, 563 S.W.3d 22, 73 (Ky. 2018) (upholding $80 million in punitive damages against accounting firm for fraud where plaintiffs were wealthy hotel and casino owners); *Interclaim Holdings Ltd. v. Ness, Motley, Loadholt, Richardson & Poole*, 298 F. Supp. 2d 746, 765 (N.D. Ill. 2004) (upholding $27.7 million in punitive damages against law firm for breach of fiduciary duty and breach of contract); *TXO Prod. Corp. v. All. Res. Corp.*, 509 U.S. 443, 459-62 (1993) (upholding $10 million punitive damages award against developer who tried to trick plaintiffs out of oil and gas rights); *Action Marine, Inc. v. Cont'l Carbon Inc.*, 481 F.3d 1302, 1321 (11th Cir. 2007) (upholding $17 million in punitive damages based on $3 million in compensatory damages against manufacturer of carbon black that discolored neighbors' properties).

Second, the *Campbell* Court directed attention to the ratio between punitive and compensatory awards. In *Campbell*, that ratio was 145 to 1. 538 U.S. at 425-25. While the Court declined to apply a single ratio, it expressed concern at a higher ratio: "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Id.* at 425. It identified instances in which the Court had upheld a 4 to 1 ratio. *Id.* In this case, the punitive damage award is a single digit ratio of 2-1. TCS cites no case in which a 2-1 award has been rejected.

Third, TCS fails even to mention any analysis of comparable penalties. It cannot rely on that factor to justify relief on appeal.

As its instance of a court rejecting a punitive award, TCS relies upon the decision of the Wisconsin Supreme Court in *Management Computer Services, Inc. v. Hawkins, Ash, Baptie & Co.*, 557 N.W.2d 67 (Wis. 1996) *("MCS")*, in which the court rejected a $1.75 million punitive award based on compensatory damages of only $65,000. The ratios between punitive and compensatory damages – 27:1 in the *MCS* case and 2:1 in this case – are markedly different.[12]

---

[12] *MCS* is distinguishable on other grounds. The Wisconsin Supreme Court stated the defendant was a regional accounting firm with relatively few offices. It was not shown to have the financial strength to make a $1.75 million punitive damage award appropriate. 557 N.W.2d at 83. TCS is very different. With annual revenue of $13.5 billion and profits in excess of $3.5 billion, the request for punitive damages was only 5% of one year's profit. (R.870; SA326:17-21.) The actual punitive damages awarded is less than 10% of one year's profit. *MCS* explains that an award of punitive damages should be sufficient to punish and deter a wrongful defendant. In the case of the multi-billion dollar TCS, the award was entirely appropriate.

Critically, TCS fails to mention what the Wisconsin Supreme Court held in *MCS*. After reviewing the evidence, it agreed with the appellate court that a punitive award of $650,000 – 10 times the compensatory award – would be reasonable. 557 N.W.2d at 83. That amount would deter the defendant from future misconduct and punish it for its wrongdoing. This is precisely the standard incorporated in the jury instruction in this case and applied by the jury. (*See* R.872, 5-6; SA396-97.)

TCS lastly argues that the punitive damages award should be set aside because it reflects passion or prejudice. The jury considered the fact that TCS is a major international company and assessed an award that was appropriate in light of TCS's size and the practical effect of the penalty. Under *MCS,* considering TCS's status does not reflect bias, but is an accurate application of the law. As numerous courts have confirmed, juries are permitted to award punitive damages based on their own application of the legal standards. *See, e.g.*, *Gore*, 517 U.S. at 568 ("States necessarily have considerable flexibility in determining the level of punitive damages that they will allow in different classes of cases and in any particular case. Most States that authorize exemplary damages afford the jury similar latitude."); *Kimble v. Land Concepts, Inc.*, 845 N.W.2d 395, 416 (Wis. 2014) (jury may rely on "[c]redible evidence" to determine punitive damages).

### C. The Punitive Damage Award May Not Be Set Aside On The Ground It Is A General Verdict.

TCS claims the punitive award must be set aside for the additional reason that the jury awarded a single amount of punitive damages – a general verdict –

which prevents this Court from determining whether it was based on a legally impermissible claim or theory. TCS is wrong. Punitive damages address wrongful *conduct*, not compensatory damage, and there is no doubt as to the conduct proven at trial.

### 1. TCS Fails To Present Grounds To Reverse A General Verdict.

To start, in the Seventh Circuit a general verdict may be upheld if supported by any theory proved at trial: the appellant must establish that the plaintiff was entitled to the award under *none* of the theories presented at trial. *See Kossman v. Ne. Ill. Reg'l Commuter R.R. Corp.*, 211 F.3d 1031, 1037 (7th Cir. 2000) ("[W]hen a jury only returns a general verdict, we need only find support in the record for one of the theories presented to the jury in order to affirm the jury award."); *Culli v. Marathon Petroleum Co.*, 862 F.2d 119, 123 (7th Cir. 1988) (same); *McGrath v. Zenith Radio Corp.*, 651 F.2d 458, 464 (7th Cir. 1981) (same). TCS raised only a general objection to the punitive damage instruction and did not ask the district court to instruct the jury to award separate punitive damages on separate claims or theories of recovery. (A46; SA307:7-SA324:2.) As a result, where the award undoubtedly finds support in the record under at least one theory, it should be upheld.

### 2. The Punitive Damages Award Addressed TCS's Conduct.

TCS's argument is based on a misstatement of the purpose of punitive damages. Punitive damages are designed to punish a defendant's improper *conduct* and to deter the defendant from engaging in that *conduct* in the future. *See supra* 47. The district court correctly reflected that principle in its punitive

damage instructions, which instructed the jury that "[t]he purposes of punitive damages are to punish defendants *for their conduct* and to serve as an example or warning to defendants and others not to engage in *similar conduct* in the future." (R.872, 5 (emphasis added).) The focus of punitive damages is on conduct giving rise to a need for punishment or deterrence, not the resulting injury.

TCS does not deny that the jury found it engaged in a concerted effort to steal Epic's intellectual property; distributed that confidential and trade secret information throughout TCS, including to employees competing with Epic; used that information; and systematically suppressed the truth before and during this lawsuit. This course of improper conduct justified punitive damages, regardless of the elements of compensatory damage.

In support of its argument, TCS cites cases dealing with the disaggregation of damages. *See* TCS Br. 70-71. TCS cites *Robertson Oil Co. v. Phillips Petroleum Co.*, 871 F.2d 1368 (8th Cir. 1989). That decision demonstrates Epic's point that punitive damages need not be tied to a particular injury where the overall course of misconduct is at issue. In *Robertson Oil*, the jury awarded compensatory and punitive damages in a general verdict based on several theories. The court affirmed one theory of liability but found three other theories could not stand. The Eighth Circuit ordered a new trial on punitive damages. It observed "[p]unitive damages are not intended to compensate an injured party, but to punish and deter *conduct* of the offending party." *Id.* at 1375 (emphasis added). The court ordered a new trial because in that case the "conduct of [defendant]

relevant to an award of punitive damages necessarily differs according to the various theories of liability on which the jury based its verdict." *Id.* at 1376. Because the four theories presented at that trial each involved different conduct, the amount of punitive damages could differ depending upon the theory. *Id.* ("the conduct of a defendant determines the amount of punitive damages"). A retrial of punitive damages was necessary to assess the reprehensibility of the actionable conduct. As to compensatory damages, however, "the same injury sustained all theories" and thus a retrial was not necessary. *Id.* This principle is at work in TCS's other cases where the conduct underlying each cause of action was not the same.[13]

Here, the same wrongful conduct supported all of Epic's theories. As the district court explained: "[t]he court's decision vacating a portion of the compensatory damages award does not undermine the jury's award of punitive damages, because the jury was not instructed to tie punitive damages to a particular type of use of Epic's trade secrets and confidential information, nor to defendants' use more generally." (A48.) Whether a particular amount of

---

[13] *See CGB Occupational Therapy, Inc. v. RHA Health Servs. Inc.*, 357 F.3d 375, 390 (3d Cir. 2004) (claim involved two separate acts of interference, only one of which was actionable, retrial needed to assess punitive damages appropriate for actionable conduct); *Marrero v. Goya of P.R., Inc.*, 304 F.3d 7, 30 (1st Cir. 2002) (court affirmed harassment claim and reversed separate claim of retaliatory transfer; retrial needed to assess punitive damages flowing from actionable conduct); *Barber v. Whirlpool Corp.*, 34 F.3d 1268, 1278-79 (4th Cir. 1994) (court affirmed malicious prosecution, reversed intentional infliction of emotional distress; retrial needed to determine punitive damages supported by actionable conduct); *Murphy Door Bed Co. v. Interior Sleep Sys., Inc.*, 874 F.2d 95, 104 (2d Cir. 1989) (court upheld unfair competition and rejected trademark infringement claim; retrial required to assess punitive damages for actionable conduct).

compensatory damages had been proven would not affect the jury's assessment of the reprehensibility of TCS's conduct and whether that conduct was worthy of punishment or deterrence.

This Court has held that punitive damages should be upheld even if it is not clear which legal theory the jury relied upon. *See Pro-Pac,* 721 F.3d at 788 ("reliance on any particular theory of tort damages does not foreclose an award of punitive damages to deter intentional wrongdoing"). In *Pro-Pac*, this Court, applying Wisconsin law, held that punitive damages could be awarded for any of the theories advanced by the plaintiff. Therefore, the Court held, punitive damages would remain available regardless of which legal theory prevailed. *Id.*

### 3. Punitive Damages Were Not Based On A Claim That Cannot Support Punitive Damages As A Matter Of Law.

TCS claims that there is no way to tell whether the compensatory award in this case was based on a theory that can support punitive damages, arguing that the jury could have awarded punitive damages on the unjust enrichment claim. TCS Br. 73. As shown in Section III.A., the jury's award of compensatory damages is the prerequisite for its award of punitive damages. Wisconsin law requires no more.

In addition, the jury was properly instructed that it could award punitive damages based only on those claims that would support punitive damages. The trial court instructed the jury: "You may only award punitive damages with respect to Epic's trade secrets, fraudulent misrepresentation and unfair competition claims." (R.872, 5.) TCS did not object to this instruction. This Court must presume the jury followed the instructions given to it. *See supra* 37.

## SUMMARY OF ARGUMENT

In "part a" of the verdict form, the jury awarded Epic damages to compensate for TCS's theft and use of information related to the comparative analysis. (SA396.) The jury was instructed that it could award additional damages in "part b" for TCS's use of "Other Confidential Information," beyond its use in the comparative analysis. (*Id.*) The jury found TCS's other uses of Epic's information warranted $100 million in compensatory damages.

During trial, the court rejected TCS's challenges to the "part b" claim and recognized TCS used Epic's information beyond the comparative analysis. (SA314; A16.) The court recognized that because "[t]here was no way that was appropriate," and because TCS "has never explained why it happened," the jury may well be able to infer from that some value was obtained by TCS. (SA197-98.)

Having correctly found a basis for presenting the "part b" question to the jury, the district court erred when it rejected the jury's answer. The district court stated TCS's Rule 50(a) submission offered "little reason to upset either portion of the jury's compensatory damage award." (A16.) Nonetheless, the court reasoned that "'the rest of the information' that TCS took and used to improve its competing software is tied to no evidence of specific use at all." (A17.) That conclusion was incorrect. The jury heard substantial evidence that TCS used stolen information to improve its Med Mantra product, could infer the same through TCS's Med Mantra-related misconduct, and was instructed it could

draw an adverse inference that TCS's destruction of evidence related to its use of Epic's trade secrets.

**CROSS-APPEAL ARGUMENT**

## I. THE COURT SHOULD REINSTATE THE JURY'S AWARD FOR TCS'S USE OF EPIC'S OTHER CONFIDENTIAL INFORMATION.

When deciding a motion for judgment as a matter of law after a jury verdict, the district court must review the trial record as a whole in the light most favorable to the verdict and determine if the verdict is "rationally connect[ed]" to the evidence. *Adams v. City of Chicago*, 798 F.3d 539, 543 (7th Cir. 2015). Without judging credibility or weighing evidence, it must "ascertain whether there exists 'any evidence upon which a jury'" could reach its verdict. *Deimer*, 58 F.3d at 343-44 (citations omitted). As to the "part b" damages, the district court failed to apply this deferential standard, which this Court should correct on appeal.

### A. The Jury's $100 Million Compensatory Damages Award For Other Use Is Supported By Substantial Evidence.

#### 1. TCS Used Stolen Epic Information To Improve Med Mantra.

##### a. Phillipe Guionnet Connects TCS's Wrongdoing To Med Mantra Development.

Phillipe Guionnet was a top-rated General Manager at TCS responsible for the Kaiser account. (R.890, 122-23.) TCS conceded at trial that much of what Guionnet said was true. (R.889, 62.) The jury heard Guionnet's extensive testimony about his discovery to "a near certitude" that Epic information had

been used in Med Mantra. (R.901, 31-32.) Guionnet backed this statement with testimony concerning particular events he witnessed in India.

Guionnet attended a TCS presentation to Kaiser executives at Apollo Hospital in India to demonstrate Med Mantra, and he was "astounded" at the improvement from prior demonstrations he had seen. (R.890, 33-37.) With his suspicions building, Guionnet sought further information about Med Mantra and received a "deep dive" about Med Mantra functionality in Hyderabad where Med Mantra development occurs. (*Id.*, 36-37.)

During that deep dive, a TCS employee showed Guionnet detailed functionality of Med Mantra using a laptop. (*Id.*, 38.) The TCS employee was introduced to Guionnet as "the interface" between the Med Mantra team and Guionnet's Kaiser team—a connection that should have never existed—which created even more suspicion of wrongdoing. (*Id.*, 42-43.) Guionnet testified that he saw cascading screens of Med Mantra functionality and workflows, which included multiple tabs broken down into layers of steps, and included lab and ambulatory functionality, two aspects of the Epic system. (*Id.*, 41-42.) Guionnet's reaction after the deep dive was that it was a "major, major offense to do something like this" because when you work for Kaiser that information should not be shared with the Med Mantra or DaVita teams. (*Id.*) Guionnet testified that at that point he no longer had suspicions of improper use of Epic's information: "basically I knew." (*Id.*, 43.)

Guionnet contacted TCS's President Suresh Muthuswami to raise the use of Epic's information in Med Mantra. Muthuswami's response was not to

investigate or remedy the wrongdoing; it was to transition Guionnet off the Kaiser account.  (*Id.*, 53-54.)

### b. Other Connections Between TCS's Wrongdoing To Med Mantra Development.

The jury heard other evidence linking TCS's wrongdoing to its Med Mantra program.  Summarizing this evidence, the district court stated:

> Epic presented evidence from which a reasonable jury could infer that its trade secrets and confidential information were used to: (1) inform TCS's U.S. entry strategy, including developing a laboratory module for its principal U.S. health care customer, DaVita, and as importantly, discerning dead ends and what *not* to do; (2) prepare a comparative analysis to insure that TCS's product would be attractive to customers; and (3) improve its Med Mantra product.

(A18.)  The evidence included the following.

TCS improperly assigned members of its Med Mantra team to its Kaiser account, which is itself evidence of improper use.  Venugopal Reddy, a senior executive on both the Kaiser team and the Med Mantra team, placed a Med Mantra employee (DV Prasad) on the Kaiser team to gather Epic confidential information, and later asked him to use that information.  Reddy lied under oath about his knowledge.  *See supra* 18, 21-23.  When Guionnet tried to remove Prasad from his team, the Head of TCS's Healthcare Unit (which included Kaiser) denied the request.  (R.890, 22.)  The district court recognized these incidents are "circumstantial proof of TCS's interest in accessing UserWeb documents for the improper purpose of furthering TCS's own software development." (R.538, 42.)

TCS used Epic's confidential and trade secret information to improve the lab product it developed for DaVita as part of its strategy for entering the U.S. market. TCS knew there were "key gaps in functional areas" that "need[ed] to be built into" Med Mantra and concluded that this would require an "[i]nvestment of 1800 person months of development effort" for TCS to make Med Mantra ready for the U.S. market. (Exs.0159A_0002; 0159; R.901, 82 (Sundar).) TCS employees downloaded documents related to Epic's "Beaker" laboratory product that Kaiser does not use, which supports the jury's inference TCS used Epic's information to benefit its own EHR system. *See also* R.900, 22:2-9 (Martin describing how the Beaker documents would have been "very valuable").

### c. The Adverse Inference Instruction Supports The Award.

The jury heard evidence that TCS's theft was not limited to illegally downloaded documents that could be ascertained. TCS accessed UserWeb over 100,000 times using Gajaram's credentials, allowing TCS to view Epic's trade secrets and confidential information, as well as to copy and paste Epic information into emails in order to share that information. (R.895, 164-65.)

TCS's intentional destruction of evidence allowed the jury to infer that documents destroyed by TCS were harmful to TCS and helpful for Epic. As but one example, the TCS proxy logs (which the jury heard were not preserved despite calls to do so) would have identified who accessed Epic's UserWeb those 100,000 times or more, including any Med Mantra employees, which also would have led to discovery of what happened to that information. *See supra* 15-16. TCS conceded that it did not know which employees, or how many employees,

had accessed Epic's UserWeb because it did not preserve its records.  *See* TCS Br. 20.  Not even knowing who accessed UserWeb, Epic was handicapped in proving what TCS did with the information it illegally obtained.

After considering the totality of the evidence including TCS's efforts to prevent the truth from being known, the jury reasonably found TCS used Epic's information to improve its Med Mantra software.  The jury's award was rationally connected to the evidence.

### 2. The Jury Heard Evidence Regarding The Value Of The Data Model, Which Was Not Part Of The Comparative Analysis Award.

Britven's testimony about what was *not* included in his $200 million opinion with respect to the comparative analysis rationally supports the jury's "part b" award for the used "Other Confidential Information."

Guionnet testified that, to a near certitude, Epic's "data model" was part of the Epic information used in developing Med Mantra.  (R.901, 31-32.)  Martin testified that Epic's data model, a critical component of Epic's software, comprised 35% of the value of Epic's overall system.  (R.900, 24:19-25:7, 37:18-23; A85.)  The jury heard that the data model was excluded from the X-analysis that quantified the value of information used in the comparative analysis.  (SA87-88, SA95 (Martin), SA136, SA157 (Britven); A85.)

The testimony reasonably connects the data model valuation to the jury's award.  Britven testified that his $200 million damage opinion did not include TCS's use to improve Med Mantra, the 100,000-plus views of Epic's UserWeb by TCS, nor other forms of information sharing by TCS.  (SA142:3-22, SA138:9-17.)

60

The jury heard Guionnet state the data model was used by TCS and Martin explain the data model comprised 35% of the value of Epic's materials. Thus, where $200 million represents the value used in the comparative analysis— approximately 65% of the total value after removing the 35% attributed to the data model—$100 million represents the remaining 35% attributed to other uses of the information.[14]

Viewing the evidence most favorably to Epic, the jury's award of $100 million for the use of the data model and other Epic information is supported by the evidence.

### B. The District Court Erred When It Set Aside The Portion Of The Jury's Verdict Relating To Other Use.

The district court erred in rejecting the jury's "part b" verdict. It concluded "the additional $100 million award for benefits obtained from 'the rest of the information' that TCS took and used to improve its competing software is tied to no evidence of specific use at all." (A17.)

The district court's conclusion ignores Guionnet's testimony entirely, and thus necessarily reflects a judgment on the credibility of a witness. Guionnet's testimony, standing alone, is sufficient to uphold a verdict for TCS's use of Epic's information to improve Med Mantra. The jury, not the court, makes credibility determinations. *United States v. Bradshaw,* 719 F.2d 907, 921 (7th Cir. 1983) (witness credibility is for a jury to weigh, not a matter of competency or

---

[14] As a reasonable approximation, total damages of $300 million are comprised of $200 million for the information used in the comparative analysis (65%) testimony and $100 million (35%) for the data model and other information.

admissibility for the court to decide); *Venson v. Altamirano*, 827 F. Supp. 2d 857, 861 (N.D. Ill. 2011), *aff'd*, 749 F.3d 641 (7th Cir. 2014) (citing *Kasper v. Saint Mary of Nazareth Hosp.,* 135 F.3d 1170, 1173 (7th Cir. 1998)) ("when a case comes down to a credibility contest, a court may not grant judgment as a matter of law simply because it believes one witness over another").  Here, the district court erred in rejecting the jury's award by discounting Guionnet's testimony and other testimony and inferences.  Viewing this evidence in the light most favorable to Epic, the verdict should stand.

In addition, the district court incorrectly attributed evidence of TCS's other use of Epic's information to the comparative analysis, stating that it "bolsters" the "part a" award.  (A17.)  Guionnet's testimony about Med Mantra was unrelated to the comparative analysis – it pertained to separate uses.  Notably, the data model that encompassed a significant portion of the value in Epic's system was not part of the comparative analysis, but was included in what Guionnet saw being used in Med Mantra.

Moreover, the district court did not address the adverse inference when striking the jury's award for use of "Other Confidential Information."  It simply nullified the evidence with respect to this issue.  The jury may consider evidence that TCS's actions prevented Epic from presenting supporting evidence and infer the missing evidence would have helped prove Epic's case.  In *Aspen Tech., Inc., supra* 38, when M3 challenged a trade secret misappropriation damages award on lack of evidence of use, the Fifth Circuit explained that the jury was permitted to find the deleted documents were unfavorable to M3 which provided jurors "a

legally sufficient basis from which to determine that M3" had used Aspen's trade secrets. 569 F. App'x at 266. *Kronisch v. United States,* 150 F.3d 112 (2d Cir. 1998), is in accord. The Second Circuit found that the adverse inference "may push a claim that might not otherwise survive ... over the line." *Id.* at 128.

The district court also raised issues relating to the amount of the "part b" award. The court stated that in its closing argument Epic asked for only $200 million related to the comparative analysis, but not another $100 million for the other confidential information. (A17.) But the plaintiff is not limited by arguments made in closing, as the district court instructed: "[d]o not measure damages based on what the lawyers ask for in their arguments." (SA39:4-9.) The jury followed the instructions, and the district court wrongly negated the jury's decision.

There was ample basis for the amount found by the jury. As explained above, considering the testimony that the data model was approximately one-third of the value of Epic's overall system, it was rational for the jury to assess the "part b" damages at $100 million, which is one-third of the overall valuation. Moreover, any doubts when estimating damages "should be resolved against the wrongdoer." *Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370, 383 (7th Cir. 1986). And "'[w]here the defendant's wrong has caused the difficulty of proof of damages, he cannot complain of the resulting uncertainty.'" *Mid-Am. Tablewares, Inc. v. Mogi Trading Co.*, 100 F.3d 1353, 1365 (7th Cir. 1996) (citation omitted). Thus, when judged under the standard of review applicable to this issue, the jury's award should be upheld.

## CONCLUSION

For the foregoing reasons, Epic respectfully requests that the Court affirm the district court's $420 million award of compensatory and punitive damages. Epic further requests that the Court reinstate the jury's additional $100 million award, and $200 million in punitive damages allowed by the Wisconsin statutory cap.

Respectfully submitted

EPIC SYSTEMS CORPORATION

By /s/Rick Richmond
     One of Its Attorneys

Michael T. Brody
JENNER & BLOCK LLP
353 North Clark Street
Chicago, IL 60654
312-222-9350
mbrody@jenner.com

Rick Richmond
    *Counsel of Record*
Nick G. Saros
JENNER & BLOCK LLP
633 West 5th Street, Suite 3600
Los Angeles, CA 90071
213-239-5100
rrichmond@jenner.com
nsaros@jenner.com

Anthony A. Tomaselli
Kristin G. Noel
QUARLES & BRADY LLP
33 East Main Street, Suite 900
Madison, WI 53703
608-251-5000
anthony.tomaselli@quarles.com
kristin.noel@quarles.com

*Attorneys for Appellee/Cross-Appellant Epic Systems Corporation*

Dated: September 23, 2019

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32(c) because, according to the word count function of Microsoft Word 2013, this brief contains 16,262 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Circuit Rule 32 and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2013 in 12 point Bookman Old Style for the main text and footnotes.

Dated: September 23, 2019

/s/ Rick Richmond
Rick Richmond

**CERTIFICATE RULE 30(D) STATEMENT**

Pursuant to Circuit Rule 30(d), I, Rick Richmond, an attorney, certify that all materials required by Circuit Rule 30(a) and 30(b) were included in the Opening Brief and Separate Appendix for Tata Consultancy Services Limited and Tata America International Corporation filed with this Court on July 10, 2019. (Dkts. 19, 20).

Dated: September 23, 2019

/s/ Rick Richmond
Rick Richmond

**CERTIFICATE OF SERVICE**

I, Rick Richmond, an attorney, hereby certify that on September 23, 2019, I caused the **Brief Of Appellee/Cross-Appellant Epic Systems Corporation** to be electronically filed with the Clerk of the Court for the United States Court Of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Pursuant to ECF procedure (h)(2) and Circuit Rule 31(b), and upon notice of this Court's acceptance of the electronic brief for filing, I certify that I will cause 15 copies of the **Brief Of Appellee/Cross-Appellant Epic Systems Corporation** to be transmitted to the court via hand delivery within five days of that date.

/s/ Rick Richmond
Rick Richmond